450 So.2d 69 (1984)
Arthur Ray LANIER
v.
STATE of Mississippi.
No. 54208.
Supreme Court of Mississippi.
April 11, 1984.
Rehearing Denied May 30, 1984.
*71 Jim W. Rose, Rose & Woodfield, William Bethea, III, Gulfport, for appellant.
Bill Allain, Atty. Gen. by Amy D. Whitten, Sp. Asst. Atty. Gen., Jackson, Albert Necaise, Gulfport, for appellee.
En Banc.
PATTERSON, Chief Justice, for the Court:
Arthur Ray Lanier was convicted in the Circuit Court of Forrest County upon an indictment charging him with the murder of Buford Dedeaux, a policeman of Gulfport, who was "acting in his official capacity ... (as) a peace officer ..." in violation of Mississippi Code Annotated, § 97-3-19(2)(a), (Supp. 1982). Lanier was sentenced to death. The homicide occurred in the First Judicial District of Harrison County but was transferred to Forrest County on a motion for change of venue. On this appeal Lanier argues (among other contentions) his arrest was illegal; videotaped inculpatory statements were improperly admitted into evidence, as was the weapon used in the homicide; erroneous selection of the jury; erroneous jury instructions; the sufficiency of the evidence to convict; the final argument of the district attorney; the lack of aggravating circumstances; and the constitutionality of the capital murder statute, § 97-3-19(2)(a).
For understanding of the issues a summary of the evidence follows which will be supplemented with exact testimony where necessary for discussion.
Policeman Dedeaux was shot to death by the defendant in the first hour of June 8, 1979, in the First Judicial District of Harrison County, near the city limits of north Gulfport. After being shot Dedeaux requested *72 assistance by radio but died shortly after the arrival of assisting officers. When the first policeman arrived he found Dedeaux in his policeman's uniform lying mortally wounded on the driver's side of his police car. At the scene, the following evidentiary items were found: a yellow bicycle, a green ditty bag, a blue watchcap, several spent .22 calibre cartridge casings and Dedeaux' service revolver. The homicide apparently occurred about 12:30 a.m. and Lanier was arrested about 5:00 p.m. the same day at his grandmother's residence in north Gulfport. He was fully advised of his Miranda rights and at approximately 1:10 a.m. on Sunday, June 10, 1979, made a videotaped statement in which he admitted shooting Dedeaux[1] under the circumstances hereinafter related.
Lanier stated that while riding his bicycle, he was stopped by Officer Dedeaux and directed to empty the ditty bag. In complying Lanier removed a pistol from the bag and Dedeaux drew his gun and fired at him. He stated that he fired at Dedeaux while running backwards but was not sure if any of the shots had actually struck Dedeaux, who entered the patrol car and radioed for help. Lanier then stated that he threw the gun away and returned to his grandmother's home. Following this statement, Lanier assisted the officers in locating the gun he had thrown away.

THE ARREST
The first argument of the defendant is that the trial court erred in permitting the jury to view and hear the videotaped statement in which he admitted shooting Dedeaux. He filed a motion to suppress "because, among other things, there was no probable cause for arrest." The trial judge conducted a hearing on the suppression motion and overruled it.[2] The defendant contends the arrest warrant for his arrest was invalid and aside from it there was not probable cause for his arrest. He argues the warrant was invalid because the affidavit of the district attorney did not set forth sufficient facts to establish probable cause for its issuance and additionally, the warrant was issued by a deputy court clerk who was neither a neutral nor detached magistrate as required by law. In responding the state urges there was probable cause for the arrest either with or without the warrant.
The following facts were established during the suppression hearing. After being shot, Dedeaux radioed other officers that he needed help, and when assistance arrived on the scene they found Dedeaux lying on the front seat of the patrol car mortally wounded. The lights of the police car were not on and Dedeaux expired without regaining consciousness.
An investigation ensued in which Prentiss Smith, an official of the Harrison County Sheriff's Department, participated. At the time his investigation began Dedeaux' body had been removed but the quest revealed a yellow bicycle with a crescent wrench and key wired to the handlebars, a blue pullover hat on the hood of the police car, and a green "ditty bag." These items were found either on or in the immediate area of the patrol car. Continued canvassing of the neighborhood adjacent to the scene yielded no further clues.
At the request of police officials, a picture of the bicycle found at the scene was displayed on local television. In response to it, Jimmy Moore contacted Officer Smith at about 1:30 p.m., June 8, 1979. Smith was informed by Moore that he and Cyril Lindsey, a companion, had been watching television and recognized the bicycle as that of Lanier. Moore explained that he and Lindsey worked at the same company with Lanier and saw him ride the bicycle to work on Thursday morning, June 7. Moore and Lindsey were brought to the police station and identified the bicycle as that of *73 Lanier. Moore and Lindsey also stated they had observed Lanier carrying the ditty bag and wearing the watchcap. These identifications linked Lanier to the homicide. The district attorney was informed of these facts and they formed the basis for the ensuing affidavit and arrest warrant.
At approximately 5:00 p.m. on June 8, Officer Prentiss Smith, who had previously participated in the investigation, served the arrest warrant by informing Lanier that he had a warrant for his arrest. The warrant was served upon Lanier at his grandmother's home at which time he was informed of his "Miranda rights" by Officer J.D. Cook. When asked if he understood these rights Lanier responded that he did.
We are of the opinion that the arrest warrant was invalid because the deputy clerk had no authority to issue it. He was neither a judge nor a conservator of the peace as defined by Mississippi Code Annotated, §§ 99-15-3 and 99-15-5 (1972). Moreover Mississippi Code Annotated, § 9-9-27 (1972), provides that, "... any reputable citizen may make an affidavit charging crime before the judge of the county court, and such affidavit shall be filed with the clerk of the county court ...," indicating as do the previous sections that the issuance of an arrest warrant is a judicial function. Nowhere do we find authority for a clerk or deputy clerk to perform such judicial function. See Martin v. State, 190 Miss. 32, 199 So. 98 (1940), and Porter v. State, 135 Miss. 789, 100 So. 377 (1924). The arrest warrant was invalid.
The state nevertheless contends that Lanier's arrest was justified pursuant to Mississippi Code Annotated, § 99-3-7 (1972) and Mississippi Uniform Criminal Rules of Circuit Court Practice 1.02 as a warrantless arrest because the arresting officer knew a felony (homicide) had been committed and reasonable grounds to believe the person arrested had committed it. As mentioned the arresting officer had participated in the investigation and had knowledge of the facts then known by the authorities. While it is true in making the arrest the officer stated that he had "a warrant" for such, we do not think this invalidates the arrest if the officer then had knowledge of facts sufficient to constitute probable cause for a warrantless arrest. See United States v. Mahoney, 712 F.2d 956 (5th Cir., 1983), and Powell v. State, 394 So.2d 326 (Miss. 1981), wherein this Court discussed the requirement of probable cause:
In Evans v. State, 275 So.2d 83 (Miss. 1973), p. 85, in quoting from a United States Supreme Court decision, we stated:
"The Court pointed out in Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948):
`In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. (338 U.S. at 175, 69 S.Ct. at 1310, 93 L.Ed. * * * at 1890).'
"It has been said that ordinarily, when the trustworthy evidence makes it clear that an offense has been committed * * and then available evidence makes it reasonable to infer that the particular person not necessarily was, but may have been, one of the offenders, most discreet and prudent men would order that person's arrest." 394 So.2d at 328.
See also Jones v. State, 358 So.2d 414 (Miss. 1978).
In Rome v. State, 348 So.2d 1026, 1027 (Miss. 1977), we stated that "probable cause means more than bare suspicion, but does not necessarily require sufficient evidence to support a criminal conviction." To the same effect see Powe v. State, 235 So.2d 920 (Miss. 1970).
Officer Smith had knowledge that a homicide had been committed. The critical issue is whether there was sufficient evidence to create a reasonable probability that Lanier had committed the homicide. A brief return to the scene of the crime might be helpful. When the Gulfport officers *74 responded to Dedeaux' distress call they found a police car with Officer Dedeaux lying near death in it with his service revolver on the ground. They also found a yellow bicycle, a blue cap, a green ditty bag and nine .22 calibre shell casings in the immediate vicinity. Later in the day they received information that Lanier had been observed riding the same bicycle on the morning preceding the homicide and that he wore a cap similar to that found on the hood of the police car.
We conclude the officer had probable cause to make the arrest without a warrant. Moreover, if it be assumed arguendo, that probable cause did not exist for either the issuance of the arrest warrant or the arrest, this does not of itself necessarily invalidate the subsequent confession. In Butler v. State, 296 So.2d 673 (Miss. 1974), we held:
The fact that the arrest in this case was without probable cause does not automatically render the confession inadmissible, but it does require an examination of the facts to determine what effect the illegal arrest had upon the giving of the confession. Bell v. State, 274 So.2d 371 (Miss. 1973); Keith v. State, 197 So.2d 480 (Miss. 1967). 296 So.2d at 675.
A discussion of the arguendo hypothetical merges into the voluntariness of the confession and will be considered on that point.

THE CONFESSION

ADMISSIBLE OR INADMISSIBLE
In arguing the confession was involuntary Lanier directs our attention to the delay of 50 or 60 hours by the Gulfport Police Department in bringing him before a judicial officer for his initial appearance pursuant to Mississippi Uniform Criminal Rules of Circuit Court Practice 1.04. He also contends the police officials continued to interrogate him after he had refused to waive his "Miranda rights," and that the confession was obtained as a result of a promise to obtain psychiatric help for him. He asserts that if any of the above contentions be insufficient to suppress, that nevertheless the "totality of the circumstances" requires suppression.[3]
The attack upon the admissibility of the inculpatory statement presents inter-related issues requiring some analysis from both Fourth and Fifth Amendment perspectives. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Hall v. State, 427 So.2d 957 (Miss. 1983). Both the United States Supreme Court and this Court have held that the threshold issue in deciding admissibility requires a determination of the statement's voluntariness. The test is whether the statement was obtained in violation of the requirement stated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If an arrestee is informed of his Miranda rights, and if upon a review of the "totality of the circumstances" it is determined that those rights were "scrupulously observed," and the statement was not obtained as a result of force, threats, coercion, or promises, then the threshold requirement of the voluntariness of the confession is satisfied. Brown v. Illinois, supra; Hall v. State, supra. See Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Lee v. State, 338 So.2d 399 (Miss. 1976).
In short, the basic analysis in evaluating the admissibility of a statement involves several factors. Was the statement voluntary under Miranda? This question forms the sine qua non. Further inquiry goes to the legality of the arrest itself. If the arrest was legal, as we have heretofore held, and the statement voluntary, then it is valid evidence. If the arrest was illegal, (as posed in hypothetical) then the analysis must include a determination as to whether *75 the statement was obtained by the exploitation of the illegal arrest. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed. 824 (1979); and Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982).
In making these determinations we consider, as did the trial court, that Lanier was arrested at about 5:00 p.m. on Friday, June 8, 1979, and was given the Miranda warning. He was then transported to the Harrison County Sheriff's office where a waiver of rights' statement was read to him by Officer Smith. Lanier then stated that he wanted to talk to his mother before signing anything. Thereafter he was removed to the city jail where his rights were read to him by Officer Pell. Later at 7:00 p.m. Detective Johnson arrived at the police department and Lanier was again advised of his constitutional rights after which he stated that he understood and signed the form which was witnessed by his brother and Officer Johnson.
Lanier's brother remained with him thereafter and according to Officer Johnson, Lanier agreed to make a statement and signed the form but then decided he did not like the word "waiver" and asked that it be deleted. After the deletion was made Lanier gave an oral statement denying that he had anything to do with the crime. At approximately 5:30 p.m. the next day, Saturday, June 9, Lanier was again given his Miranda warnings and moved from the city jail to the Gulfport Police Department, where he once again signed a waiver of rights form at about 8:00 p.m. after deleting the words "waiver of rights," and answered some general questions after which he remained alone until nearly 11:00 p.m. At approximately 11:20 p.m. after again being advised of his rights, he asked for his mother who came to the police department at about 12:30 a.m. After Lanier had visited and talked with his mother, he signed a waiver of rights form and made the videotaped statement which is presently argued to be inadmissible because it was not voluntarily taken.
Our review of this record reveals beyond peradventure of doubt that Lanier knowingly and voluntarily waived his right to remain silent and, accordingly, the questioning to which he submitted was not constitutionally prohibited. Although he was not pleased with the "waiver of rights" language he nevertheless discussed the homicide in question with officers and gave a videotaped statement at approximately 1:10 o'clock on the morning of June 10, 1979, after he was warned of his constitutional prerogatives, after he had executed a formal waiver of those rights and after he had visited with his mother and who was present when the statement was given. We have scrutinized this record in great detail and are unable to discern any testimony indicating that the statement resulted from an assumed invalid arrest. We reiterate that it is our opinion there was probable cause for the arrest. We now hold there was no inducement or coercion to obtain the statement from Lanier by way of promise of hope or reward; nor do we find any evidence of physical or mental coercion for the statement through delay or any violation of Miranda v. Arizona, supra.
We need address, however, the contention of Lanier that he was promised mental health assistance. We think the argument advanced is out of context with the statement and assumes that the help offered was conditioned upon his confession. The record shows otherwise as is excerpted from the transcript:
"JOHNSON: O.K. Are you aware of what you're saying?
"LANIER: Yes sir.
"JOHNSON: Are you saying it on your own free will?
"LANIER: Yes sir.
"JOHNSON: Without any promises or threats?
"LANIER: Did, uh, the only thing they said `bout helpin' me give me some mental help.
"JOHNSON: Well, if you need mental help, you know we'll help you.
*76 "LANIER: Well, I don't know why I did it. I don't know why."
Lanier's mother testified this colloquy was made prior to the confession and that the officers told her son they would give him help. It need be noted the help was forthcoming whether the statement was given or not and there is nothing to indicate the officers made Lanier any promise for the purpose of inducing him to make his statement. In State v. Beck, 390 So.2d 748, 749 (Fla.App. 1980), it is stated:
... non-particularized comments ... concerning medical or psychiatric assistance ... do not result in exclusion of a confession, so long as the aid is not offered in return for a consequent statement.
As stated, we are of the opinion the trial court did not err in denying the motion to suppress and did not err in later admitting it into evidence during the trial-in-chief.

THE STATEMENT
Cardinal to the disposition of this case is the statement of Lanier which was introduced by the state. Since Lanier did not testify at trial, the statement's verbage is nakedly before us without explanation. It is extremely important because the court must determine from it whether Lanier was or was not entitled to a manslaughter instruction. Less opening remarks, the statement follows in pertinent part:
"(OFFICER) JOHNSON: Okay. What we're concerned here with is the killing of Gulfport Police Officer Buford Dedeaux, and it happened early Friday morning, approximately 1:00 A.M., which would be the 9th of June, 1979. And you've been arrested and charged with Murder, and what I'd like you to do, in your own words is explain to me everything that happened that night.
"(OFFICER) DANIELS: 'Scuse me Tom, that's the 8th.
"JOHNSON: Oh, is it the 8th?
"DANIELS: 8th of June.
"JOHNSON: Okay.
"DANIELS: Approximately 12:45.
"JOHNSON: Okay.
"DANIELS: 8th of June.
"JOHNSON: 12:44 A.M.
"DANIELS: Correct.
"JOHNSON: Okay. Uh, would you do that?
"(APPELLANT) LANIER: Yes sir.
"JOHNSON: Okay.
"LANIER: Well, on that, on that particular night, no, thank you, I was riding around. I went to my brother's house, took a bath, riding around on the bicycle. I took my bath. And, and I didn't have nothin' to do. I went to the club, drunk a little beer, and smoked some weed.
"JOHNSON: What club did you go to?
"LANIER: Club Shangri-Lai.
"JOHNSON: Okay.
"LANIER: And I just rode around, and I went back to my brother house. He was in the bed sleeping and I woke him up, and we chat, and he told me a friend of mine Kenny Martin told me to come by his house and uh I went by.
"JOHNSON: Alright, what were you riding on?
"LANIER: 10-speed bike.
"JOHNSON: That yellow one?
"LANIER: Yes sir.
"JOHNSON: Okay.
"LANIER: And uh, I ain't have nothin' on my mind you know. I was already loaded. And stop by and chat with him, couldn't find no, no Marijuana cigarette paper so I got on my bike and I started ridin'. I stopped by this young lady house uh they call her Cochise. She had some paper, and I smoked a joint with her. I got a few little paper and put 'em in a uh little envelope I had with some Marijuana in it. I told her I'm gone take me a ride. I don't know where I'm going. And I started ridin' and uh I ended up ridin' down 25th and this, this police car was checking, checking out, checking the store when I was riding'. I even thought he was gonna stop me and had it on my mind and when he called me and stopped me, I got scared. I started thinking.
*77 "JOHNSON: Alright, why were you scared?
"LANIER: I had a gun on me, some Marijuana, and influenced out, under influence of Marijuana, alcohol, and I was scared, I wasn't thinking right. I had in my mind to keep on ridin', don't stop, but I stopped. I don't know why and he asked me to take my stuff out the bag.
"JOHNSON: Was he out of the car?
"LANIER: He was out the car.
"JOHNSON: Where was he standing?
"LANIER: He was standing on the right hand side where I was, and uh, I started taking stuff out of my bag, and by that time I got some of the stuff out the bag, he had pulled his weapon out, and when I pulled mine out,
"JOHNSON: What did you pull out?
"LANIER: I pulled out a .22 automatic revolver holds ten rounds, you know ten shots in it and when he shot, saw the gun, he shot at me first. I got more scared. I thought he was gonna kill me, and I just froze, started pulling the trigger, and he went, he went to the car like there wouldn't nothing wrong, started, got on the radio, called, called in for some backup, and I didn't know he was hit, and I started running.
"JOHNSON: Where were you when he called?
"LANIER: I was 'bout twenty feet from the car.
"JOHNSON: From the rear of the car?
"LANIER: From the rear of the car. When I realized what I had done, I was halfway down the track. I throwed the gun away. I ran. I hid up in the box car after I jumped out, after I came up the water, got in the box car. I kneeled down and then I prayed to God, asked God please forgive me. I ain't mean to shoot him please forgive me. I ain't mean to shoot him, I know he had some kids cause I ain't mean to do it (inaudible) cause I don't know if I killed him or not. I don't know if I hit him, but I know I done wrong. I asked him to forgive me. He told me to go on home. I went home and I ran all the way home, knocked on my grandma's door. She opened the door and I went to sleep.
"JOHNSON: About what time was this that she answered the door?
"LANIER: It was 'bout, I really, I couldn't say cause I, I, I left the young lady's house 'bout.
"JOHNSON: Alright, the shooting took place at almost 1:00 o'clock.
"LANIER: Almost 1:00 o'clock? It was 'bout fifteen after one I guess cause I took time out and prayed, and I came home. She opened the door. I came in, said my prayers, asked God to forgive me again and look after his family if I killed him or if I hurt him. I didn't know, really know. And I went to sleep. Asked, falling to sleep, asked my grandma to wake me up to go to work. I went to work and everybody, police was all around and uh, I thought that he was still living, and I heard he was dead. There wasn't nothing I could do about it but just wait. I wouldn't gone run. And,
"JOHNSON: Alright, the uh the hat, were you wearing a hat?
"LANIER: No sir. I wasn't wearing no hat. Hat was in the bag.
"JOHNSON: It was in the bag. Okay, how did it get on the hood of the car, on the uh,
"LANIER: I put it on the,
"JOHNSON: On the fender of the car?
"LANIER: Fender? It was on the hood of the car. I don't know how it got on the fender. Wind musta blowed it. All I know it was on the hood.
"JOHNSON: Okay, well, the hood, alright. How did it get there?
"LANIER: I put the hat on the hood.
"JOHNSON: Okay, uh, when you were talking to Officer Dedeaux, which way were you facing?
"LANIER: Facing 49.
"JOHNSON: Alright, and which way was he facing?
"LANIER: Facing me.
*78 "JOHNSON: Okay. How, how close were you?
"LANIER: Believe 'bout four feet apart.
"JOHNSON: About four feet apart?
"LANIER: Yes sir.
"JOHNSON: Alright, how did the uh how far were you when, when you fired your first shot?
"LANIER: I don't know. When, when he shot first, I backed up I think and probably back a couple of feet.
"JOHNSON: About two feet away?
"LANIER: I backed about two feet away from him.
"JOHNSON: Alright, do you know where your first shot went?
"LANIER: No sir. All I did, all I know I just shot. I don't know if my eyes was open or not. And when I realized he was going to the radio, call for help, I ran, just kept running and then I look-, got down the railroad track a piece, I stopped and looked at my gun, and I throwed it away.
"JOHNSON: Alright, about where did you throw the gun?
"LANIER: Behind West Building Materials somewhere.
"JOHNSON: Alright, did you, you were running north on the railroad tracks?
"LANIER: Northwest.
"JOHNSON: Northwest? Alright, did you throw the gun to the right or the left? Did you throw.
"LANIER: To the right.
"JOHNSON: You threw it in an eastern direction?
"LANIER: Yes sir.
"JOHNSON: Okay, uh it go into some woods or uh,
"LANIER: Some woods I think.
"JOHNSON: Bushes or what?
"LANIER: Woods, bushes.
"JOHNSON: Do you think you could remember the place where you threw it?
"LANIER: Think so.
"JOHNSON: Okay. Are you willing to take us there and help us recover the gun?
"LANIER: Yes sir.
"JOHNSON: Okay. Is there anything else that you can remember?
"LANIER: No sir. No more than what I told.
"JOHNSON: Alright. Is there anything else you want to add?
"LANIER: No.
"JOHNSON: Okay.
"LANIER: Less ya'll have you know questions.
"JOHNSON: Okay. Do you have anything, Chief?
"(OFFICER) PAYNE: Ray, exact, was it, the place where you and Officer Dedeaux had your confrontation,
"LANIER: Yes sir.
"PAYNE: Were you near any stores? You said it was near 25th Avenue. What vicinity of 25th Avenue was it in?
"LANIER: Yes sir, it was 'tween Yeager's and uh trailer lot.
"PAYNE: The car was up in the parking lot there between Yeager's and the uh,
"LANIER: It's like,
"PAYNE: Trailer lot?
"LANIER: It's like he was coming out on 25th.
"JOHNSON: Which way?
"LANIER: He was, he was headed south.
"JOHNSON: Alright, which way was the car facing?
"LANIER: South.
"JOHNSON: Okay.
"LANIER: Front of the car was facing south.
"PAYNE: Which way were you heading?
"LANIER: South.
"PAYNE: You were heading south too? Do you remember how many times you shot the gun?
*79 "LANIER: No sir. All I remember, I pulled the trigger one time. I don't know how many times it went off.
"PAYNE: Did, did Officer Dedeaux discharge his weapon at you?
"LANIER: He fired at me first.
"PAYNE: How many times did he shoot his weapon?
"LANIER: I think once or twice. I don't know. Every, everything happened so fast I don't know.
"PAYNE: Does uh, Ma'am, would you like to ask your son anything?
"(LANIER'S MOTHER) FAIRMAN: (inaudible)
"JOHNSON: Pardon?
"FAIRMAN: Think I don't know about what he's saying, ask his daddy.
"LANIER: That ain't gonna do it. I didn't want to go down 25th, but uh I wasn't thinking. I was just ridin'.
"JOHNSON: Were you scared.
"LANIER: After I was stopped.
"JOHNSON: That's what I mean.
"DANIELS: Ray, where did, where was the gun at when uh Officer Dedeaux walked up to you? Where did you have the gun?
"LANIER: In the bag.
"DANIELS: In the bag?
"LANIER: It was concealed in the bag.
"DANIELS: Did he see the gun?
"LANIER: No sir. He said to, he saw the handle part when I pulled it out. He shot 'bout time I had, 'bout time he pulled his trigger, I had, I done had it, had my gun out. He shot. I shot back. I think I just shot one time but I don't know how many times it went off.
"JOHNSON: Alright, did you shoot as you were running?
"LANIER: Running back.
"JOHNSON: You were running backwards?
"LANIER: I just, not backwards, kind of sideway, wasn't too much to look at.
"JOHNSON: Do you remember which hand Officer Dedeaux, Dedeaux held his gun in?
"LANIER: Lefthand I think.
"JOHNSON: His lefthand?
"LANIER: Think so.
"JOHNSON: Okay. Do you have anymore questions?
"LANIER: Left, left or
"DANIELS: I have none.
"JOHNSON: Okay. Ray, the statements that you just gave, were they true and correct to the best of your knowledge?
"LANIER: In the name of Jesus my Lord, yes."

.....

DID THE COURT ERR IN REFUSING A MANSLAUGHTER INSTRUCTION?
Lanier contends the trial court erred in refusing him a manslaughter instruction. Instruction D-10 was requested and refused by the trial court. The reason or reasons for its refusal is not revealed by the record although we do observe instructions on self-defense were granted. The defendant cites in support of his contention Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), both of which unequivocally hold that a manslaughter instruction is proper and essential "when the evidence warrants." This, of course, accords with this Court's holding in Jackson v. State, 337 So.2d 1242, 1255 (Miss. 1976), where we held that instructions on a lesser included offense, "should only be given after the trial court has carefully considered the evidence and is of the opinion that such an instruction is justified by the evidence." See Dase v. State, 356 So.2d 1179 (Miss. 1978); Lee v. State, 130 Miss. 852, 94 So. 889 (1923); and other cases to the same effect which are too numerous to mention. In fact this Court has held in the following cases that the homicide of a law enforcing officer can be manslaughter. See Williams v. State, 122 Miss. 151, 84 So. 8, 14 (1919) (homicide of a deputy sheriff); Jones *80 v. State, 170 Miss. 581, 587, 155 So. 430, 432 (1934) (homicide of city policeman); Coleman v. State, 218 Miss. 246, 67 So.2d 304, 305 (1953) (homicide of a town marshall).
More recently in Spencer v. State, 348 So.2d 1030 (Miss. 1977), a prosecution for the capital murder of a police officer under Mississippi Code Annotated, § 97-3-19(2)(a), (Supp. 1976), it was held that manslaughter was an appropriate lesser included offense and that a manslaughter instruction should be granted on retrial to accord with the dictates of Jackson v. State. The state acknowledges the import of Beck v. Alabama, and Hopper v. Evans, but contends the evidence in this case does not warrant such an instruction and therefore there was no error in refusing it.
The state then contends, as we understand its brief, Mississippi Code Annotated, § 97-3-19(2)(a), (Supp. 1974), only requires proof of (1) the victim was a peace officer or fireman acting in his official capacity; and (2) the defendant had knowledge that the victim was such officer to establish guilt of capital murder. From this it is argued the only method the defendant could meritoriously claim entitlement to a manslaughter instruction would be the lack of proof on either one or both of the two essential elements named to raise the homicide to capital status. It is then urged that the court should draw an analogy in this case to that which was held in Bell v. Watkins, 692 F.2d 999 (5th Cir.1982), a capital murder case of this state predicated upon the felony-murder doctrine. It was held in Bell that once the underlying felony is proved, there is no lesser included offense such as simple murder. This holding is the result of an analysis of Mississippi Code Annotated, § 97-3-19 (1972), which designates as capital any homicide perpetrated during an enumerated felony. Though admitting Bell to be inapposite the state nevertheless asks this Court to adapt such logic to the slaying of a peace officer or fireman while either is acting in an official capacity. We reject this analogy because § 97-3-19(2)(a) does not set forth an underlying felony as does § 97-3-19(1)(a), (b), (c) (Supp. 1982), and moreover it overlooks this Court's holding in Spencer v. State, 348 So.2d 1030 (Miss. 1977), and Jackson v. State, 337 So.2d 1242 (Miss. 1976), both of which authorize a manslaughter instruction in proper cases if warranted by the evidence.
In our opinion the issue is whether there was evidence in the record justifying a manslaughter instruction so that the jury might consider such lesser offense in its deliberation of this capital murder case.
In deciding this question it need be noted that Lanier's statement (confession) was introduced by the state and in it Lanier stated, and repeated several times, that Officer Dedeaux fired first. There is no other evidence, as such, in the record since the defendant did not testify at trial. Lanier's statements are corroborated to the extent that three empty cartridge hulls were found in Dedeaux' revolver and a chemical test of the decedent's left hand (Dedeaux was left handed) established that he had fired a handgun within a short time prior to his demise. Although it might be argued, as it was, that Lanier fired first inasmuch as Dedeaux, an experienced officer, would have injured or killed Lanier had he fired first because the two men were within point blank range, no more than four or five feet of each other. This assumption, if pursued, generates another inference which is that Lanier fired first mortally wounding Dedeaux and that the officer's aim, in returning the fire, was faulty because of his wounds. Assuming these inferences to be valid, which we do not, the contradiction arising from the assumed inferences and Lanier's statement introduced into evidence creates, at best, a conflict between inferences and testimony which could only be resolved by a jury under the guidance of proper instructions. Without the inferences the testimony is uncontradicted that Dedeaux fired first and because of this he was entitled to the manslaughter instruction.
Finally, in our opinion, the jury's verdict of guilty of capital murder thereby *81 rejecting Lanier's theory of self-defense is not contradictory to his theory of manslaughter. Justifiable homicide, killing another, to protect one's self from death or serious bodily injury under extreme and imminent circumstances does not necessarily exclude manslaughter. A jury might properly find from the evidence in a particular case that the threat of death or serious bodily injury was not imminently pending and thereby reject the theory of self-defense and the acquittal of a defendant. From the same facts a jury reasonably could, we think, if permitted to do so by a manslaughter instruction find a defendant not guilty of capital murder because the fatal shot was in response to a shot first fired by an officer in a tense, sudden confrontation arising without design of either party, thereby reducing the offense to manslaughter with a corresponding reduction in sentence.
We are of the opinion the evidence, our decisions, and due process of law entitled Lanier to an instruction on manslaughter. In view of this determination we do not reach other questions presented upon the sentencing phase of the trial. We therefore reverse on the guilt phase and remand for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
HAWKINS, DAN M. LEE and PRATHER, JJ., concur.
BOWLING, J., and ROY NOBLE LEE and WALKER, P.JJ., dissent.
ROBERTSON and SULLIVAN, JJ., not participating.
BOWLING, Justice, dissenting:
Respectfully dissenting, I shall attempt to show why, in my opinion, the majority are wrong in reversing this case because of the failure of the court to grant appellant its requested Instruction D-10  the so-called manslaughter instruction. There are several reasons why there is no reversible error resulting from the refused instruction.
I have no quarrel with the authorities cited in the majority opinion. My first contention is that the refusal of the instruction was not error under those cases where they say that the "lesser included offense instruction should be given, if the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater." Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982); Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); and Jackson v. State, 337 So.2d 1242 (Miss. 1976) and others.
It may be trite to remind that the facts of every case are different. There is no resemblance in the facts of the case sub judice when compared to all other cases. We therefore first need to analyze this case to determine whether or not the evidence required the giving of a manslaughter instruction to defendant under the above cited authorities.
We start with the undisputed capital murder requirement that appellant admittedly killed "a peace officer while such officer was acting in his official capacity ... with knowledge that the victim was a peace officer." Mississippi Code Annotated, Section 97-3-19 (1974).
We next take note that appellant's entire contention that the case justified "manslaughter" is based on the case presented by the state. We give appellant the benefit of every constitutional right against testifying or introducing no other evidence whatsoever.
We first note the physical facts that the deceased was in a well-marked law enforcement vehicle with a law enforcement canine in its cage on the rear seat and the deceased policeman was lying on the front seat of the said car which was located near the rear of a business establishment. The policeman had time to call on his radio for help prior to dying.
Other than the physical facts, the majority relies solely on the statement of appellant given two days after the killing, which statement was introduced by the state and as mentioned above was never disputed, *82 contradicted varied or explained by appellant at the trial.
Now let us look at the glaring pronouncements by appellant in his statement. He affirmatively stated that he was "loaded" on drugs and alcohol. He positively stated that when the deceased policeman passed him in the police car, "I started thinking." He was stopped in a partially secluded area by Officer Dedeaux. When Officer Dedeaux was trying to get to his radio, appellant was "'bout twenty feet from the car." Officer Dedeaux was "'bout four feet" from appellant when the officer shot and made a remarkable miss.[1] Appellant then "probably backed a couple of feet" and unloaded his ten-shot automatic pistol at the police officer.
Now comes the part of the state's case, uncontradicted, unexplained and relied on by appellant to say "I only committed manslaughter." When the investigating officers first arrived, appellant's hat was on the fender of the car. Appellant contended that it was on the hood of the car "because I put it on the ... it was on the hood of the car. I don't know how it got on the fender... . All I know is it was on the hood." Again, "I put the hat on the hood."
What we have, therefore, is the admitted, uncontradicted, unexplained and reiterated statement of appellant that he was "'bout twenty feet from the car"; the deceased and appellant were "'bout four feet apart" when the policeman allegedly fired the first shot; the appellant "probably backed a couple of feet" and then appellant, without contradiction or explanation, admitted reaching the car as the policeman was attempting to call for help and placed his hat on the hood of the car. We can take judicial notice that in addition to the positive statement that appellant placed his hat on the car's hood, the hat certainly did not fly through the air for twenty-five feet and land on the hood. The appellant had to be advancing to a position beside the car to have placed his hat thereon at the time Officer Dedeaux was attempting to secure assistance, whether he was mortally wounded at the time or not.
The trial court had the above undisputed, uncontradicted and unexplained testimony of appellant introduced by the state to compare with the admitted proof of every requirement of capital murder; that is, "killing a police officer, acting in his official capacity with knowledge that the victim was a peace officer."
We come to another point. At no time either prior to the trial below, during the trial, or before this Court has appellant contended that he killed Officer Dedeaux "in the heat of passion". His sole defense and his sole requested instructions omitted this element, but on the other hand, he offerred a positive defense of "self-defense." In appellant's principal instruction No. D-9, given by the trial court, it is contended:
The Court instructs the jury that in deciding upon the guilt or innocence of ARTHUR RAY LANIER, you should determine what an ordinary and rasonable man might have reasonably inferred from all the facts and circumstances by which the evidence shows that ARTHUR RAY LANIER was at the time surrounded, and, in doing so must not try him in the light of subsequent developments, nor must you require of him the same cool judgment that the jury can now bring to bear upon the occurrence. The jury must put themselves, as far as possible, in ARTHUR RAY LANIER's place, and then judge whether the danger was apparent, or should have been considered apparent by a man of ordinary caution and prudence in like condition.
The Court instructs the jury that although you may find in this case that ARTHUR RAY LANIER was armed at the time he was stopped by the deceased on the night in question, if you also believe that ARTHUR RAY LANIER never had any intent to kill Buford Dedeaux, and that he was then and there faced with a situation where the deceased *83 pulled his pistol and shot in the direction of ARTHUR RAY LANIER, and that ARTHUR RAY LANIER then and there reasonably believed that Buford Dedeaux was attempting to shoot him and that ARTHUR RAY LANIER had reasonable cause to believe and did believe that he was in imminent danger of being killed or receiving serious bodily harm at the hands of Buford Dedeaux and that it was necessary to shoot at him to save his own life, then in that event you should find ARTHUR RAY LANIER not guilty. (Emphasis that of the writer of this opinion).
The Instruction D-10 called the refused manslaughter instruction appears in the record as follows:
The Court instructs the Jury that if you find that the State has failed to prove any one of the essential elements of the crime of capital murder, you must find the defendant not guilty of capital murder, and you will proceed with your deliberation to decide whether the State has proved beyond a reasonable doubt all the elements of the lessor crime of manslaughter.
If you find beyond a reasonable doubt that Arthur Ray Lanier killed Buford Dedeaux, a human being, without malice but by his own action by the use of a deadly weapon, without uathority of law, and not necessarily in self-defense, then you shall find the defendant, Arthur Ray Lanier, guilty of the crime of manslaughter.
First, it is readily apparent that the refused instruction was completely inconsistent with the requested and given Instruction D-9. The latter emphasized "that it was necessary to shoot him to save his own life, then in that event you should find Arthur Ray Lanier not guilty." The so-called refused manslaughter instruction required the jury to find that the shooting was "not necessarily in self-defense." The only criteria that this instruction could have given the jury was that it should find for the defendant, if the shooting not necessarily in self defense was "without malice."
The instruction obviously was based on Mississippi Code Annotated, Section 97-3-35 (1972), which reads as follows:
The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.
The refused Instruction D-10 completely omitted an essential requirements of the statute; that is, that in addition to the killing being without malice, it absolutely required that it be "in the heat of passion." There is an alternative in the statute wholly disconnected with the requirement that the killing be "without malice in the heat of passion;" and that is that it can either be "in a cruel or unusual manner" or "by the use of a dangerous weapon without authority of law and not in necessary self-defense."
It is therefore inescapable that assuming appellant to have been entitled to a manslaughter instruction, the submitted D-10 was erroneous and properly refused. It did not require an essential element of manslaughter, statutorily required; that is, without malice, in the heat of passion. (Emphasis supplied). No other instruction on the issue of manslaughter was submitted to the court for consideration. Obviously, appellant recognized the inconsistency in saying first that, "I shot because he shot at me" and in the same breath saying, "I shot because I was in the heat of passion." The appellant obviously placed all his eggs in one basket when he secured his principal instruction on self-defense and relied on that instruction to explain away his advancing twenty-two feet to the police car and placing his hat on the hood of the car at a time when according to appellant's contention, the policeman had retreated "'bout eighteen feet" in an effort to perform his duties properly and in an effort to secure assistance either before or after being shot.
*84 Appellant's positive testimony through his statement, completely unrefuted, was that although he first retreated a couple of feet, he then advanced more than twenty feet to the car with Officer Dedeaux retreating in front of him. The statement reaffirmed by appellant through no denial was that during this time he emptied his ten-shot automatic pistol toward the retreating policeman.
With deference, the hereinabove discussed portions of evidence of appellant on his second contradictory affirmative defense of manslaughter completely over-comes his excuses for killing Officer Dedeaux, "after thinking ..., while loaded on marijuana and alcohol, ... after removing his ten-shot automatic pistol from his ditty bag and after Officer Dedeaux shot first."
Finally, we have pointed out that the submitted Instruction D-10 should not have been given because the undisputed and reaffirmed evidence of appellant through his statement did not permit a jury rationally to find other than the defendant killed Officer Dedeaux at a time when the latter was a peace officer, acting in his official capacity, and at a time that appellant knew that Mr. Dedeaux was so acting.
Next, as above discussed, we contend that the requested instruction was not legally correct and could not have been given.
Another distinct and separate reason for dissenting from the majority opinion is that with the situation of no proper manslaughter instruction submitted or given, this Court has held a number of times that a jury may return a verdict of manslaughter, although there is no instruction to the jury on this subject. Dobbins v. State, 207 So.2d 96 (Miss. 1968); King v. State, 251 Miss. 161, 168 So.2d 637 (Miss. 1964); and Triplett v. State, 159 Miss. 365, 132 So. 448 (1931).
Even though appellant hung his hat on "self defense" and deliberately left out of his contradictory defense of manslaughter that it had to be done "in the heat of passion," the jury could have returned a manslaughter verdict had it not found from the evidence and proper instructions that all the elements of capital murder were proven beyond a reasonable doubt. It is clear that the jury chose the latter proof, fully supported by the evidence, rather than finding that appellant deliberately shot to defend himself or shot in the heat of passion.
I would affirm.
WALKER and ROY NOBLE LEE, P.JJ., join in this dissent.
ROY NOBLE LEE, Presiding Justice, dissenting:
In my judgment, the lower court did not commit reversible error when it refused Instruction D-10 requested by the appellant. Therefore, I dissent from the majority opinion and join the dissenting opinion of Justice Bowling, with additional comments.
Pertinent parts of appellant's confession are set out in the majority opinion. Justice Bowling has analyzed them. Appellant said that he pulled his pistol out of the bag and, when Officer Dedeaux saw it, the officer shot. Law enforcement officers are trained to use such force as may be necessary to protect themselves, particularly, when a suspect has and displays a firearm. In the high risk crime area where appellant was stopped, Officer Dedeaux had the right to fire first when appellant pulled his gun from the bag. Indeed the officer would have been derelict, from his training and experience, had he not fired. However, the physical facts and inferences indicate a different scenario, as outlined by Justice Bowling.
In concluding, the majority opinion states:
Finally, in our opinion, the jury's verdict of guilty of capital murder thereby rejecting Lanier's theory of self-defense is not contradictory to his theory of manslaughter. Justifiable homicide, killing another, to protect one's self from death or serious bodily injury under extreme and imminent circumstances does not necessarily exclude manslaughter. A jury might properly find from the evidence *85 in a particular case that the threat of death or serious bodily injury was not imminently pending and thereby reject the theory of self-defense and the acquittal of a defendant. From the same facts a jury reasonably could, we think, if permitted to do so by a manslaughter instruction find a defendant not guilty of capital murder because the fatal shot was in response to a shot first fired by an officer in a tense, sudden confrontation arising without design of either party, thereby reducing the offense to manslaughter with a corresponding reduction in sentence.
That conclusion is seriously flawed. A bifurcated trial was held. During the guilt phase, after being instructed on appellant's right of self-defense, the jury could have found appellant not guilty, or, following the majority line of thinking, could have found appellant guilty only of simple murder. Instead, the jury found appellant guilty of capital murder. We cannot say the evidence does not support that verdict. Therefore, a proper manslaughter instruction would have afforded appellant no relief.
Appellant's theory of what occurred (officer shot first) was before the jury, during the sentencing phase of the trial. It was for consideration by the jury as a proper mitigating circumstance. The jury could have fixed life imprisonment, but, again, appellant's defense was rejected and the death penalty was imposed. We cannot say the jury was wrong.
I think the jury was instructed properly, the manslaughter instruction correctly was refused, and the conviction and judgment of the lower court should be affirmed.
Therefore, I respectfully dissent from the majority opinion.
WALKER, P.J., and BOWLING, J., join this dissent.
NOTES
[1] A typed transcript of the videotaped statement is included in the record. The videotape was viewed and heard by the jury.
[2] This suppression hearing was conducted by the Honorable Kosta Vlahos, Circuit Judge of Harrison County, although the Honorable Jack Weldy, the Circuit Judge of Forrest County, presided over the trial on the merits.
[3] It should be noted that four of Lanier's other assignments of error, i.e., those relating to the admissibility of the gun, the application of the Weathersby rule, the failure of the trial court to grant a directed verdict, and the question of the aggravating circumstances presented to the jury in the sentencing phase of the trial are all directly affected by the determination of the admissibility of the confession.
[1] Appellant had no mark whatsoever on him. It is wholly unbelievable that a trained, experienced officer, such as Dedeaux, would miss at four feet unless he was already injured.