539 So.2d 1324 (1989)
Bart Helgrin MEASE
v.
STATE of Mississippi.
No. DP-84.
Supreme Court of Mississippi.
February 1, 1989.
David G. Hill and John Paul Barber, Oxford, for appellant.
Mike Moore, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., and Jeffrey M. Rosamond, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
We know the sheriff has been shot and killed. We know who did it. We know the community's sense of loss and outrage, for we are a part of that community. The judicial function divines the legal consequences of this dastardly act.
Not every killing is legally murder. Even where the victim is a peace officer, the positive law of this state  depending upon the facts  defines several genera and species of homicide with life or death differences in punishment. Our oaths charge that we examine what happened at trial and determine how the choice among those legally defined genera and species has been made, and whether that making conformed to law, for if conformity to law be lacking, we are bound to reverse.
*1325 Where the facts may fit two or more of the legally defined genera of homicide, the accused may of right demand that the jury be instructed of the alternatives the law affords. Only then may the jury know its duty. Here at the very least the facts on one reasonable interpretation reflect that Bart Helgrin Mease was guilty of capital murder under Miss. Code Ann. § 97-3-19(2)(a) (Supp. 1988).[1] On another reasonable interpretation the facts reflect Mease guilty of manslaughter within Miss. Code Ann. § 97-3-27 (1972).[2] The jury was not told it could or should consider the manslaughter option. We reverse and remand.

II.

A.
Osborne Bell was elected sheriff of Marshall County, Mississippi on November 6, 1979. He served his people with distinction. Sheriff Bell was a leader in law enforcement and in his community as well. He died in the line of duty on the morning of May 7, 1986.
Bart Helgrin Mease, then 22 years of age, and Paula Lush, 32 at the time, were "social friends" who had met recently in Atlanta. On Tuesday evening, May 6, 1986, the two set out from Atlanta in a rented white convertible Mustang, their destination Lush's hometown of Wyatte, Mississippi, thirteen miles from Holly Springs, ostensibly to move Lush's effects back to Atlanta. Mease came along to ride Lush's motorcycle back for her.
Mease and Lush appear very much a part of this society's drug culture. For most of the afternoon before they left Atlanta, each used methamphetamine and lidocaine. On the road each injected more of the same drugs, drinking caffeine (coffee) every three hours or so. Mease was using maybe three times more of the drugs than Lush, though nothing turns on the point.
When they neared Lush's hometown early Wednesday morning, Mease pulled the car off Highway 4 onto Highway 309, in southwest Marshall County. Mease turned the car around and parked facing south on the right side of the road and got out to freshen up. Lush became nauseous. They remained on the side of the road about two or three feet off the pavement for about an hour as Lush tried to quell her nausea.
Bernice Totten, Supervisor for the Fourth District of Marshall County, was preparing a work crew for a job that day. She received an unidentified call over her CB radio that a suspicious vehicle was *1326 parked on Highway 309. Totten drove past the rented vehicle, took down the license number, radioed it in to the Marshall County Sheriff's Office and went on to work.
Deputy Sheriff Walter Bell, Osborne's third cousin, was on duty when Totten's call came in. The dispatcher gave Walter[3] the call and he went to the scene. Approximately thirty minutes after Totten came by, Walter pulled his marked vehicle across the highway and parked nose-to-nose with the Mustang. Walter got out of his car and approached the Mustang.
Lush thinks she may have met Walter halfway. As he neared the car Walter saw "particles and syringes and cotton" on the driver's side on the ground. Walter asked for Mease's license. As he did so he noticed a spoon in the ashtray and on the back seat a jug of liquid and luggage. There was an open black leather bag on the top of the vehicle. Walter noticed "track marks" on both Lush and Mease's arms, and Mease admitted to being a user.
Walter ran a license check which came up clean. He went back to the car and, with Mease's and Lush's permission, looked through the property in the back seat. With Lush's permission, Walter searched the trunk, finding a box of syringes.
At this point Walter called in for aid. He returned to Lush and Mease's car and told them someone else was coming out and to wait. Walter did not read them their rights but agrees that "at that point I probably would not have let them go." Lush says they waited about forty-five minutes; Walter says fifteen. Lush and Mease smoked by the car, reached into it for more cigarettes, and talked. There was a small, loaded .22 caliber pistol belonging to Lush resting in a side panel in the driver's door. For some reason Walter did not find or remove it. At some point, according to Lush, she told Mease to get rid of the pistol but, just prior to the Sheriff's arrival, Mease put the pistol in a red bag he was carrying.
Sheriff Osborne Bell, in uniform, arrived and parked his patrol car across the highway from the other vehicles. Walter walked over to the Sheriff's car and they agreed to take Lush and Mease into custody. Lush and Mease were asked to empty their pockets. While the Sheriff brought Lush (and her small dog) back across the road to his car, Walter retrieved needles and a jug of what appeared to be alcohol from bushes near the car.
The Sheriff placed Lush in the passenger side of the front seat of his patrol car. Then the Sheriff removed a .357 Magnum he kept on the front seat and placed it, still in its holster, on the trunk of his car. The Sheriff opened the back door of his vehicle (the passenger side which faced the trees), and Walter walked Mease over to the car, handing him to the Sheriff. Walter testified that he had patted down Mease, who was dressed in shorts, for a weapon by this time. Lush was never frisked. Walter then lifted the .357 from off the trunk.
As the Sheriff began to handcuff Mease, Walter says Mease grabbed the Sheriff, putting his right hand across the Sheriff's right shoulder. Lush says Mease grabbed the Sheriff from the rear. Mease and the Sheriff began to scuffle. Walter came around from the other side of the car to intervene not knowing, he says, that Mease had the small .22 pistol in his hand. Walter hit Mease over the head with the butt of his .357. Then he hit him again. The pistol discharged and the bullet struck the Sheriff in the neck.
The defense rests its case on the premise that Mease fired reflexively, not intentionally. Walter says his .357 discharged once. Two spent shells, however, were found from the .357 and one from the .22  the bullet had passed through Sheriff Bell's head and exited his ear. In corroboration, Lush heard three gunshots.
Lush got out of the car and saw Mease lying face down on the ground with a flesh wound. The Sheriff was still standing, *1327 with blood shooting from the side of his face. He then went to his knees. Walter was extremely upset but at Lush's prompting, called for an ambulance. Mease, still conscious, was lying about eight inches from the .22 on the ground.
Apparently, there was considerable delay (up to an hour and one half) before a helicopter finally took Sheriff Bell to a hospital in Memphis, where he died. State Medical Examiner Dr. Thomas Bennett, an expert in pathology and forensic pathology, found a perforating wound consistent with a small caliber projectile. The wound was a "tight contact range" gunshot which means, Dr. Bennett testified, "the end of the gun barrel was tightly held against the skin when the shot was fired." There can be no doubt that the shot Mease fired proximately caused Sheriff Bell's death.
Meanwhile Mease was taken to the Marshall County Hospital only twelve miles away. Mease was taken into custody at the hospital by Officer Kenneth Dickerson of the Mississippi Highway Patrol. Mease told Dickerson that he had shot the Sheriff with a small gun he had under his watch band.

B.
Bart Helgrin Mease was indicted May 12, 1986, by a Marshall County Grand Jury for the capital murder of Osborne Bell. Miss. Code Ann. § 97-3-19(2)(a) (Supp. 1988). Trial of the case was transferred to Winston County upon Mease's motion for a change of venue. The case was called for trial in Louisville, Mississippi, on March 30, 1987, before a Winston County jury. That jury returned a verdict that Mease was guilty of capital murder. The next day the same jury sentenced Mease to death.
From his conviction and sentence, Mease appeals to this Court.

III.

A.
Today's outcome determinative issue is Mease's argument that the Circuit Court erred when it refused to instruct the jury on manslaughter and to direct the jury to consider whether it ought to return a manslaughter verdict. The record reflects that the defense requested five separate manslaughter instructions, each of which was refused.[4] None of these instructions, it should be added, adequately tracked the language of the particular manslaughter statute implicated by the facts, Miss. Code Ann. § 97-3-27 (1972), a point to which we return later.
*1328 The Circuit Court refused all five manslaughter instructions, stating
There has been absolutely no evidence in this record as to this crime being manslaughter as opposed to capital murder. There has been absolutely no evidence that the Defendant did not know that the deceased was a law enforcement officer, and consequently, I could not give a lesser included offense instruction as to simple murder in this case, Mr. Hill. I simply do not believe that the evidence and facts presented would bear the granting of a lesser included offense.
The defense concedes that Sheriff Bell was killed as a result of a round fired from the weapon which Mease was holding. However, Mease maintains that one fair interpretation of the evidence is that the gun fired as a result of a reflexive action not giving rise to the required elements of Section 97-3-19(2)(a); hence, his entitlement to a manslaughter instruction.

B.
At common law the jury was permitted to find the defendant guilty of any lesser offense necessarily included in the offense charged. Beck v. Alabama, 447 U.S. 625, 633, 100 S.Ct. 2382, 2387, 65 L.Ed.2d 392, 400 (1980); see 2 C.Wright, Federal Practice & Procedure, § 515, n. 54 (1969). This rule developed as an aid to the prosecution in cases in which the proof failed to establish some element of the crime charged.
Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.
Keeble v. United States, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973).
A second tenet of common law validated the offense of felony-murder: an unintentional killing in the perpetration of or in an attempt to perpetrate a felony constitutes murder. 40 C.J.S. Homicide, § 21; Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953). This common law rule has been modified by statute in some jurisdictions, including Mississippi.
In some jurisdictions, the courts have established the doctrine that a homicide occurring in the commission, or attempt to commit, a felony other than one specified in the felony-murder statute may be first degree murder or murder in a lower degree.... Of course, though a homicide occurring in the commission, or attempt to commit, a felony other than one specified in the felony-murder statute may at least constitute some lower grade of culpable homicide.
40 Am.Jur.2d, Homicide, § 72.

C.
Mississippi has gone one step beyond this general statutory exception, for we have adopted a statute, among others, which provides that a homicide, without intent, and in the course of a felony not enumerated, is manslaughter. Miss. Code Ann. § 97-3-27 (1972) states:
The killing of a human being without malice, by the act, procurement, or culpable *1329 negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.
There can be little doubt that Bart Mease was guilty of some crime when he cocked his pistol and pointed it at Sheriff Bell. Most probably we would label Mease's other crime aggravated assault. Miss. Code Ann. § 97-3-7 (Supp. 1988). But aggravated assault is not a felony within the exclusions of the manslaughter statute, Section 97-3-27. The killing of a human being without malice and by culpable negligence remains murder only where done in the course of one of these four: rape, burglary, arson or robbery. By no stretch of the imagination may Mease's "other" conduct be said to fit one of these. The defense sought to prove at trial that Mease fired his pistol accidentally, as a reflexive action induced by the head blows he received from Walter. We faced an analogous situation in O'Bryant v. State, 530 So.2d 129 (Miss. 1988) and concluded
Even if the killing was accidental, at most it would have reduced the crime from murder to manslaughter.
530 So.2d at 134. For the moment it is sufficient that the accidental, reflexive discharge of a cocked, loaded pistol killing another may be manslaughter.
That Osborne Bell was a peace officer does not render his death capital murder per se, nor does it preclude a conclusion of Section 97-3-27 manslaughter if the facts otherwise fit. Lanier v. State, 450 So.2d 69, 79-80 (Miss. 1984), where a peace officer was slain, holds on similar facts that "a manslaughter instruction is proper and essential when the evidence warrants," and, as well, that "the homicide of a law enforcing officer can be manslaughter." Lanier, 450 So.2d at 79; see Williams v. State, 122 Miss. 151, 84 So. 8, 14 (1919); Jones v. State, 170 Miss. 581, 587, 155 So. 430 (1934); Coleman v. State, 218 Miss. 246, 67 So.2d 304, 305 (1953).
Today's issue has been addressed in Spencer v. State, 348 So.2d 1030 (Miss. 1977), where we said:
Hendrick Spencer was convicted of the capital murder of a police officer under the provisions of Mississippi Code Annotated section 97-3-19(2)(a) (Supp. 1976) and was sentenced to death.
* * * * * *
Appellant has also assigned as error the trial court's refusal to grant an instruction that defined the lesser included offense of manslaughter and permitted the jury to find the defendant guilty of that offense if supported by the evidence. The question is answered by Jackson v. State, supra [337 So.2d 1242 (Miss. 1976)].
[W]hen warranted by the evidence, the trial court may instruct the jury with reference to lesser included offenses. However, such an instruction should not be indiscriminately or automatically given, as was condemned in Roberts v. Louisiana, supra, 428 U.S. [325] at 334, 96 S.Ct. [3001] at 3007, 49 L.Ed.2d [974] at 982 [(1976)] but should only be given after the trial court has carefully considered the evidence and is of the opinion that such an instruction is justified by the evidence.
(337 So.2d at 1255)
The trial judge was without benefit of the Jackson holding during the trial of the case, but should follow its ruling and instruct the jury as to lesser included offenses if the evidence adduced upon retrial should justify the giving of such instruction.
Spencer, 348 So.2d at 1030. Bart Mease, the same as any other criminal defendant, is of right entitled to have the jury instructed regarding any offense carrying a lesser punishment arising out of a common nucleus of operative fact with the scenario giving rise to the charge laid in the indictment. See also Griffin v. State, 533 So.2d 444 (Miss. 1988).

D.
We have repeatedly held that the accused is entitled to a lesser offense instruction *1330 only where there is an evidentiary basis in the record therefor. Lee v. State, 469 So.2d 1225, 1230 (Miss. 1985); Ruffin v. State, 444 So.2d 839, 840 (Miss. 1984); Colburn v. State, 431 So.2d 1111, 1114 (Miss. 1983). Such instructions should not be granted indiscriminately, Lee v. State, 469 So.2d at 1230, see, e.g., Ruffin v. State, 444 So.2d at 840; Colburn v. State, 431 So.2d at 1114, nor on the basis of pure speculation. People v. Simpson, 57 Ill. App.3d 442, 448-49, 15 Ill.Dec. 463, 466, 373 N.E.2d 809, 812 (1978); Fairchild v. State, 459 So.2d 793, 801 (Miss. 1984).
Our evidentiary standard is laid out in Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985):
[A] lesser included offense instruction should be granted unless the trial judge  and ultimately this Court  can say, taking the evidence in the light most favorable to the accused and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one essential element of the principal charge).
Harper, 478 So.2d at 1021; Fairchild, 459 So.2d at 800; Lee v. State, 469 So.2d at 1230-31. Harper employs slightly different language than Ruffin v. State, 444 So.2d at 840:
[O]nly if this Court can say, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, and considering that the jury may not be required to believe any evidence offered by the state, that no hypothetical reasonable jury could convict [the defendant] of simple murder, can it be said that the refusal of a lesser included offense instruction was proper.
See most recently Rowland v. State, 531 So.2d 627, 631 (Miss. 1988).
A third and simpler version is found in Monroe v. State, 515 So.2d 860, 863 (Miss. 1987): "[T]he evidence in a particular case generally warrants granting a lesser offense instruction if a `rational' or a `reasonable' jury could find the defendant not guilty of the principal offense charged in the indictment yet guilty of the lesser included offense." Only where the evidence could only justify a conviction of the principal charge should a lesser offense instruction be refused. (emphasis added) Ruffin v. State, 444 So.2d at 840; Fairchild, 459 So.2d at 800; Lee, 469 So.2d at 1231. Reflection makes clear that all of these tests are different ways of saying the same thing.
Neither the trial court nor this Court should ask which way the evidence preponderates  capital murder or the lesser offense.
[W]e likewise do not merely ask if there is sufficient evidence to sustain the jury's verdict of guilty of capital murder. The answer to that question in this and other cases may be `yes' and there still be reversible error in not giving the lesser-included instruction.
Fairchild, 459 So.2d at 801.
This rule is wholly applicable in prosecutions brought under this state's capital murder statute. Fairchild, 459 So.2d at 800; Lanier v. State, 450 So.2d 69, 79-81 (Miss. 1984); see also Hill v. State, 432 So.2d 427, 440-41 (Miss. 1983); Johnson v. State, 416 So.2d 383, 387-88 (Miss. 1982); In re Jordan, 390 So.2d 584, 585-86 (Miss. 1980); Spencer v. State, 348 So.2d 1030 (Miss. 1977). Indeed, where the state seeks imposition of the penalty of death, the rule takes on constitutional proportions. Beck v. Alabama, 447 U.S. 625, 632-33, 100 S.Ct. 2382, 2387, 65 L.Ed.2d 392, 400 (1980); Hopper v. Evans, 456 U.S. 605, 611-12, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367, 373 (1982); Jackson v. State, 337 So.2d 1242, 1254-55 (Miss. 1976). Further, "in a capital murder case, of course, all doubts should be resolved in favor of the accused." Fairchild, 459 So.2d at 801; Gambrell v. State, 92 Miss. 728, 736, 46 So. 138, 139 (1908).

E.
Having in mind the substantive definition of manslaughter found in Section *1331 97-3-27, and, as well, our Harper-Lee-Fairchild evidentiary standard, we turn to the proof.
There we find the following:
(a) Mease was under the heavy influence of drugs.[5] Paula Lush, Mease's traveling companion, testified to the fact that "since the previous day approximately from the time I ran into him ... maybe every hour, two hours," the two were doing drugs, methamphetamine, lidocaine and caffeine. Also found in or near the car was cocaine and "a green leafy substance." Furthermore, Mease admitted to Walter Bell that he was a user.
(b) The jury heard testimony from Paula Lush which attempted to show Mease's state of mind prior to the shooting. While standing by their car waiting for Sheriff Bell to arrive, Lush said that Mease "made the statement to me, he said you don't want to go back to jail, do you? I said, no, I don't, but what do you have in mind? He said, nothing, you know. Don't worry about it. I'm not ... I don't mean to hurt anybody or anything." I said, "Well, this is no problem, no big deal; just be cool, you know." And he said, "Well, you know, okay."
(c) Mease resisted Sheriff Bell and pulled his .22 pistol and pointed it at the sheriff. Mease was guilty no doubt of any of several offenses, ranging from resisting arrest, Miss. Code Ann. § 97-9-73 (1972), to disorderly conduct, Miss. Code Ann. § 97-35-7(3) (1972), to carrying a concealed weapon, Miss. Code Ann. §§ 97-37-1 and 17 (1972), to assault and aggravated assault, Miss. Code Ann. § 97-3-7 (Supp. 1988). What is important for the moment is that Mease's offenses do not include rape, burglary, arson or robbery. Mease shot Sheriff Bell while engaged in a felony other than those listed in Section 97-3-27.[6] Conversely, even if Mease's firing his pistol was an accident, he is at least guilty of manslaughter. O'Bryant v. State, 530 So.2d 129, 134 (Miss. 1988).
(d) Mease's pistol may have discharged as a result of reflexive action, not deliberate design.
(i) Mease and Lush waited free to roam about and in their car for between fifteen and forty-five minutes for Sheriff Bell to arrive without provoking an altercation with Walter.
(ii) Mease scuffled/struggled with Sheriff Bell, apparently with Mease's gun in his hand, for a period of time without shooting the sheriff. The defense elicited this testimony from Walter in order to show both that Mease had prior opportunity to shoot the sheriff and that the shot was a result of reflex:
MR. HILL: [Mease's attorney]
All right. The fight started and when it started you were over here.
WALTER BELL:
Correct.
HILL:
On the opposite side of the automobile from where the sheriff and Mr. Mease were standing.

*1332 BELL:
That's correct.
HILL:
And while you proceeded around this car Mr. Mease and the sheriff were fighting and Mr. Mease had a gun. You agree with that?
BELL:
At the time I didn't know he had the gun.
HILL:
All right. But you agree that he had a gun?
BELL:
I do now.
HILL:
And you agree that during this span of time Mr. Mease did not fire this gun.
BELL:
That's correct.
HILL:
And you got to the other side of the car where the two of them were standing and Mr. Mease still did not fire that gun.
BELL:
That's correct.
HILL:
And at that point you yourself had a weapon, did you not?
BELL:
Yes.
HILL:
Actually you had two weapons, didn't you?
BELL:
Yes.
HILL:
You had one strapped here on your side.
BELL:
That's correct.
HILL:
And you were holding this weapon right here in your hand?
BELL:
That's correct.
HILL:
And you approached the two of them. Mr. Mease still had not shot. The gun had not fired, had it?
BELL:
That's correct.
HILL:
By the time you got there the gun had not fired, had it?
BELL:
That's correct.
HILL:
And then when you got to the side of the automobile where Mr. Mease and the sheriff were standing, you took this weapon and you hit Mr. Mease in the head with it, didn't you?
BELL:
That's correct.
HILL:
You hit him in the head with it more than one time, didn't you?
BELL:
Twice.
HILL:
Do you recall exactly the number of times that you hit him?
BELL:
That's my recollection, twice.
HILL:
Do you have a vivid personal recollection of hitting him twice as you are sitting here today?
BELL:
I do.
HILL:
When you struck him with this weapon in the head, he still did not fire that gun or that gun did not fire, did it, the gun that he was holding?
BELL:
No.
HILL:
And then you proceeded to hit him again, didn't you?

*1333 BELL:
That's correct.
HILL:
And it's your testimony that when you hit him the second time, his gun discharged?
BELL:
No, when I hit, it just then discharged. It was like a second before it went off.
Paula Lush corroborated this testimony by describing that no gunshots were fired until after Walter hit Mease.
(iii) The testimony of three doctors to varying degree buttress the possibility that an unintended, reflexive action by Mease generated the fatal gunshot. Dr. Thomas Bennett, the forensic pathologist employed as the State Medical Examiner for Mississippi who performed an autopsy on Sheriff Bell, admitted on cross-examination the possibility that head trauma from the .357 used to hit Mease could possibly trigger a reflexive action resulting in the shooting. He doubted that that's what happened in this case, principally because the wound was one of "close contact", but he considered it possible:
I'm not saying a reflex didn't happen. I hope that didn't come across. A reflex could have happened. He could have been hit on the head and the trigger could have been pulled. In my opinion the reflex of pulling the trigger would also pull back the gun from the skin surface. In that scenario of a reflex pulling the trigger, it would not be what I see in this case. I'm not saying that the reflex could not have occurred, but in my opinion the wound would have been different from what Sheriff Osborne Bell had.
Then later:
Q. And let's assume that I am Mr. Mease and I have a gun in my right hand and I have the gun pushed right up here with considerable pressure on your neck so that you understand that I do in fact have a weapon. I have my other hand holding you like this, holding you with one hand on the weapon and the other hand on the other side of your neck or shoulder. We are wrestling and I am holding this weapon on you tightly against your skin and I am hit on the head and the gun goes off. Now, isn't it possible under these circumstances, you holding me and me holding you from both sides of you [sic] head that that gun could have gone off in response to a reflex in the muscles and produce that wound?
A. It's possible.
Q. What did possible mean?
A. The definitions of possible and probably are not the same. When I say possible, if something is less than fifty percent. Over fifty percent, then it's probably. Then you have absolute beyond that. Possible, yes, it is possible. Probable, in my opinion, no.
(iv) Dr. Marvin Wilson, Chairman of the Department of Pharmacology of the University of Mississippi, was posed the following hypothetical:
Q. Doctor, I'm going to ask you a question and I'm going to ask you to assume certain facts.
A. Okay.
Q. I want you to assume that an individual is using methamphetamine mixed with lidocaine for 18 to 20 hours and has consumed some caffeine during this period of time and I want you to assume further that this use of methamphetamine mixed with lidocaine has been continuous and regular during this period of time. And I want you to assume further that this person who has used these drugs is ... receives a rather sharp stimulus such as a blow on the head with a hard object. Do you have a professional opinion assuming those facts as to the likelihood as to ... do you have a professional opinion concerning the reflex or reaction of the delicate muscles of the body as opposed to the larger more denser muscles of the body?
He eventually responded.
A... . The fine delicate muscles of the body would react [more] readily to this *1334 stimulus change than if these drugs were absent.
Outside of the jury the doctor testified that "the movement of the hand and fingers could be enhanced and not a movement of the whole arm or other large muscle group of the whole body." In response to the Court's question whether that prospect was a probability or a possibility, Dr. Wilson responded:
BY THE WITNESS:
It's a very strong probability that that is possible. The way the question is phrased can that occur, it can occur, but the determining factor is the strength of the stimulus. A blow on the head would stimulate the muscles of hands and fingers to contract.
Back before the jury Dr. Wilson was allowed to answer the above hypothetical more fully:
Q. Is it probable based on your opinion  in your opinion based on your training, education and experience what is the probability or can you state the probability to a reasonable scientific certainty as to the hand moving without the arm moving at all.
A. Well, there's absolutely no question that it would take less of a stimulus change to cause the hand to move than it would to cause the arm to move. Now whether or not the arm could move at the same time would be dependent upon the intensity of the stimulus change.
(v) Dr. Charles Long, professor of Psychology at Memphis State University and professor of Neurology and Psychiatry at Tennessee Medical Center, also testified. In response to a similar hypothetical posed to Dr. Wilson, Dr. Long added to the prospect that a reflexive action could result from head trauma.
A. Yes, sir. In a situation like you describe there are a number of possibilities. Obviously one reflexive response that people tend to think about is withdrawal or reflexing of the limb at the joint like at the elbow. That would be a more dramatic reflexive response. That's more likely to occur to withdraw from a source of tissue damage at the periphery. If something burns your hand, cuts your hand, you're going to withdraw from that. If you step on something sharp, you're going to withdraw from that. You're going to back away from that source. When the damage comes to your head, you are more likely to move your body. You're more likely to move your head away from it. The force itself is likely to cause you to tighten up the muscles, increase muscle tone and it would increase the likelihood if you had a firearm that was cocked and this can only be fired if you have the thing back, then you increase the likelihood of that muscle tone causing that gun to fire.
(e) Pointing and aiming a cocked, loaded .22 pistol at another is culpable negligence, though done without intent to kill or harm.
Without further ado, we hold that the evidence was such that, when viewed under the Harper-Lee-Fairchild standard, Mease was entitled as of right to have the jury instructed regarding the elements of Section 97-3-27 manslaughter. Beyond that, he was entitled to have the jury told that, if it found the elements of Section 97-3-27 manslaughter, it could return a verdict that Mease was guilty of manslaughter and not capital murder.

F.
The defense labored mightily at trial toward establishing the principal element of manslaughter  the absence of legal malice, i.e., deliberate design to effect death. Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1988). Mease tendered no fewer than five instructions to that effect, not to mention several on self-defense and excusable homicide. None, however, fit precisely the standard of Section 97-3-27. Does Mease's assignment of error fail because his lawyer failed to request the right kind of manslaughter instruction?
*1335 We faced an analogous question in Harper v. State, 478 So.2d 1017 (Miss. 1985). Harper was being prosecuted for burglary of an inhabited dwelling. He asked that the jury be instructed on the lesser offense of trespass. The trespass instruction tendered by counsel was deficient in form. In that context we held that the trial court has a duty to reform the tendered instruction or advise defense counsel of the perceived deficiencies and afford a reasonable opportunity to prepare another instruction.
In Harper we cited Thomas v. State, 278 So.2d 469, 472-73 (Miss. 1973) and said:
Where the disputed instruction relates to a central feature of the case and where there is no other instruction before the court which treats the matter, Thomas holds it error to refuse an instruction on grounds that "it has been inartfully drawn".
278 So.2d at 472. We then noted that we had followed a like approach in Lee v. State, 469 So.2d at 1232 with respect to a lesser included offense instruction (which like the instruction here had been taken verbatim from the statute defining the lesser included offense) and also in Rainer v. State, 473 So.2d 172, 174 (Miss. 1985).
We continued in Harper:
In the case at bar, the trespass instruction relates to a central feature of the case; indeed, the entire defense offered by Harper was that he was only guilty of trespass. No other instruction was presented to the trial judge by either the State or by Harper which treated the trespass issue. Under those circumstances assuming that the Instruction D-5 as tendered was in improper form, the trial judge at the very least, and in addition to his Newell[[7]]-based authority to modify, had the obligation to advise counsel for Harper of the nature of the deficiencies of the proffered instruction and afford counsel a reasonable opportunity to present a new instruction.
We concluded our Harper decision holding that Harper was entitled to have the lesser included offense of trespass submitted to the jury via a properly worded instruction. The trial judge's refusal of tendered Instruction D-5, coupled with his failure to reform that instruction or advise Harper's counsel of the perceived deficiencies therein and to afford Harper [sic] counsel a reasonable opportunity to prepare another instruction, constitutes error which requires reversal. Lee v. State, 469 So.2d at 1232.
Harper, 478 So.2d at 1022-23; see also Guilbeau v. State, 502 So.2d 639, 643 (Miss. 1987). We observe a like rule in civil cases. Byrd v. McGill, 478 So.2d 302, 305 (Miss. 1985).
To be sure, there is a fine distinction that may be made. Harper concerned an inartfully drawn trespass instruction. Our statute law defines no less than eleven species of the genus manslaughter. Miss. Code Ann. § 97-3-27 thus -47 (1972). The manslaughter instructions sought by the defense seem directed to unlawful act manslaughter under Section 97-3-31 and heat of passion manslaughter under Section 97-3-35. Where the principal defense theory was manslaughter and where five separate manslaughter instructions were sought, the case is well within the best view of the principle justifying Harper.
Here each element of the Harper test is satisfied. This is a legally sufficient evidentiary predicate for a Section 97-3-27 manslaughter instruction. The issue "relates to a central feature of the case." Harper, 478 So.2d at 1022. Defense counsel fired five shots, offering five separate manslaughter instructions, albeit none hit the target. The Circuit Court refused all five, albeit on grounds Mease was entitled to no manslaughter instruction, not merely that those tendered were in improper form. We have explained above how and why this view was legal error. The point for the moment is that the Circuit Court's ruling leaves no doubt that a Section 97-3-27 instruction would have been refused had one been tendered in correct form.
Mease was of right entitled to have the jury instructed upon  and that it must *1336 choose between  two legally distinct genera of homicide, one capital and the other noncapital. The Circuit Court's handling of the point failed to conform to our positive law. Having in mind our obligation of heightened scrutiny in review of capital cases, see, e.g., Williamson v. State, 512 So.2d 868, 872 (Miss. 1987) and Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978), we have no authority but to reverse.
The judgment of the Circuit Court that Bart Helgrin Mease stands convicted of capital murder and shall suffer the penalty of death is hereby reversed, vacated and held for naught. This case is remanded to the Circuit Court of Marshall County for a new trial on all issues.
REVERSED AND REMANDED.
HAWKINS, DAN M. LEE, P.JJ., PRATHER, SULLIVAN and ZUCCARO, JJ., concur.
HAWKINS, P.J., specially concurs by separate written opinion, joined by SULLIVAN and ZUCCARO, JJ.
ZUCCARO, J., specially concurs by separate written opinion, joined by HAWKINS, P.J.
ROY NOBLE LEE, C.J., dissents by separate written opinion, joined by ANDERSON, J.
PITTMAN, J., not participating.
ROY NOBLE LEE, Chief Justice, dissenting:
With deference, I think that the majority opinion has missed the mark in reversing and remanding the capital murder conviction and death sentence of Mease and, therefore, I dissent from that opinion.
Mease was convicted under Mississippi Code Annotated § 97-3-19(2)(a) (Supp. 1986) which is different from any other capital murder. It provides in part:
97-3-19(2)(a). The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
a. Murder which is perpetrated by killing a peace officer or fireman while such officer or fireman is acting in his official capacity or by reason of an act performed in his official capacity, and with knowledge that the victim was a peace officer or fireman. For purpose of this paragraph, the term "peace officer" means sheriffs of counties and their deputies, constables, marshals and policemen of cities and towns, ...
It is uncontradicted that Mease killed Sheriff Osborne Bell; that the slaying was without authority of law; and that it was committed by Mease holding a small cocked revolver against the neck of Sheriff Bell; that Mease fired the weapon propelling the.22-caliber bullet through the upper area of his left neck and through his right ear. It is further uncontradicted that Sheriff Bell was acting in his official capacity and, at the time of the fatal shot, he had arrested Mease and was attempting to place Mease in the sheriff's patrol car. Mease knew that Bell was an officer conducting the arrest, i.e., the sheriff. Concededly, Mease was under the influence of drugs and probably alcohol. As stated in the majority opinion, Footnote 5, that condition provides no defense. Cummings v. State, 465 So.2d 993, 995-96 (Miss. 1985); McDaniel v. State, 356 So.2d 1151, 1161 (Miss. 1978).
In my opinion, the record contains no evidence which would justify or support a manslaughter instruction. Mease and his companion Lush observed Sheriff Bell and the deputy sheriff conduct a search of the Lush automobile and the area around it and saw them find items of evidence indicating their illegal activities. Mease concealed a tiny .22-caliber revolver, 3 1/2" long, either in the palm of his hand or on the inside of his wrist. Sheriff Bell arrested him, took hold of Mease's arm, and was attempting to put him in the patrol car, when Mease resisted the arrest, scuffled with the sheriff in an apparent attempt to *1337 get loose, cocked the revolver, and placed it against the sheriff's neck. In that situation, the deputy sheriff interceded and attempted to separate Mease from the sheriff, not seeing the small revolver. The deputy struck Mease on the head with the butt of the deputy's .357-caliber service revolver and Mease fired the bullet into the sheriff's neck. Mease then turned upon the deputy, obviously with the intent to shoot him, at which time the deputy fired twice, inflicting a flesh wound upon Mease.
The testimony of the three medical experts as to possible reflexive action by Mease does not support a manslaughter instruction. The scintilla that the majority opinion relies upon is that there could be a "possibility" that when the deputy struck Mease with the .357 Magnum revolver, Mease could have discharged his revolver by reflexive action. On the other hand, they indicated that the probability was that reflexive action did not cause the gun to fire.
The small .22-caliber revolver Mease used to kill the sheriff was introduced as an exhibit. It is a five-shot, single action, revolver; it has to be cocked manually before firing; and the trigger must be pressed tightly backward in order to trip the hammer, thereby causing it to fall and plunge the firing pin into the cartridge casing. All of those steps required positive action by Mease before the projectile was exploded into the sheriff's neck.
The well settled law in this state is that jury instructions are not given unless there is an evidentiary basis for such in the record. Gray v. State, 472 So.2d 409, 417 (Miss. 1985); Colburn v. State, 431 So.2d 1111, 1114 (Miss. 1983); Fairchild v. State, 459 So.2d 793 (Miss. 1984). Under the facts and the law, I am of the opinion that the lower court correctly refused the requested manslaughter instructions and that the judgment and sentence of the lower court should be affirmed.
ANDERSON, J., joins in this opinion.
PITTMAN, J., not participating.
HAWKINS, Presiding Justice, specially concurring:
The indictment in this case charged Mease with wilfully, feloniously and of his malice aforethought killing and murdering Osborn Bell, a peace officer.
To convict him of any kind of murder it was incumbent upon the State to prove beyond a reasonable doubt that Mease, with a deliberate design, shot and killed Bell. To increase the crime to capital murder, it was incumbent upon the State to prove not only murder, but murder by Mease with knowledge that Bell was a peace officer. To make the slaying of a peace officer capital murder, there is first the requirement that all the elements of murder be proved as well. See: Miss. Code Ann. §§ 97-3-19(1)(a); 97-3-19(2)(a).
Mease did not testify in his own behalf. He is the only person in the world who knows whether he shot Bell intentionally or accidentally. In my dissent in White v. State, 532 So.2d 1207, 1224-1226 (Miss. 1988), numerous cases are cited and discussed which hold that it is not the duty of the court to conjure possible defenses for an accused who does not testify in his own behalf. This is, of course, especially true when the accused is the only person who can answer whether a slaying with a deadly weapon was something other than murder. I would certainly agree with the dissent in this case, therefore, except for one fact: the testimony of the deputy sheriff that Mease did not fire the.22 caliber pistol until he had been struck up beside the head twice with a .357 caliber Magnum pistol. This raised a factual issue of whether it was the pistol blows on his head which caused the .22 to fire, or whether it was an intentional, deliberate act by Mease to shoot Bell. A trial jury would have been perfectly free to totally reject the contention that it was an accident, and especially so since Mease did not choose to testify. But Mease was clearly entitled, in view of this testimony, to have the hypothesis of accident submitted to a jury under proper court instructions.
*1338 As the majority notes, we have a number of manslaughter statutes, and the defense did not choose the correct one. Had it done so, I am confident the very able circuit judge would have granted it. There have been very few cases under Miss. Code Ann. § 97-3-27, and it no doubt escaped the circuit judge's attention as it manifestly escaped the attention of defense counsel.
As the majority rightly concludes, in my view, in order to justify an instruction authorizing a jury to convict of a lesser crime than the one with which the accused stands charged it must be a lesser "included" offense.
This Court has been extraordinarily lenient with the State, however, in that we have repeatedly authorized the circuit court to grant the State a manslaughter instruction when manslaughter was clearly not a lesser included offense. We have authorized manslaughter instructions be given the State when the proof showed that the accused could only be guilty of murder or innocent. Harrison v. State, 307 So.2d 557, 652 (Miss. 1975); Moore v. State, 194 So. 921 (Miss. 1940); Bradford v. State, 161 So. 138 (Miss. 1935); Calicoat v. State, 131 Miss. 169, 95 So. 318 (1923). It was in Calicoat v. State that this Court started down this road, holding  despite vigorous dissents  that it was "harmless error" to give a manslaughter instruction to the State where there was proof from which the jury could find the defendant guilty of murder.
This Court having been rather lenient to the State in granting manslaughter instructions, in my view, constitutes ever more reason for Mease's entitlement to such an instruction in this case.
SULLIVAN and ZUCCARO, JJ., join this opinion.
ZUCCARO, Justice, specially concurring.
Agreeing wholly with the decision reached in the majority opinion, the sole purpose of this concurrence is to simplify the root question presented. Was the killing of Sheriff Osborne Bell murder or was it manslaughter? Do the facts, substantially uncontradicted, support a verdict of capital murder? The answer is yes. Do the facts support a verdict of less than murder, i.e., manslaughter? The answer, in my view, is also yes. Testimony was adduced at trial that when the deputy sheriff struck Mease with a.357 magnum revolver Mease could have discharged his revolver  killing Sheriff Bell  by reflexive action. Perhaps the "probability" is that it wasn't reflexive action at all and that Mease is guilty of capital murder. But this is for a properly instructed jury to decide. The jury was entitled to weigh this testimony and reach either a murder or manslaughter verdict. Accordingly, the trial court cannot, nor can this Court, take those two verdict options away from the jury. By denying appellant's request for manslaughter instructions the jury was not properly or sufficiently instructed as a matter of law and, therefore, I would reverse and remand for a new trial.
HAWKINS, P.J., joins this opinion.
NOTES
[1] Miss. Code Ann. § 97-3-19(2)(a) (Supp. 1988) reads:

The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
a. Murder which is perpetrated by killing a peace officer or fireman while such officer or fireman is acting in his official capacity or by reason of an act performed in his official capacity, and with knowledge that the victim was a peace officer or fireman. For purpose of this paragraph, the term "peace officer" means sheriffs of counties and their deputies constables, marshals and policemen of cities and towns, game wardens, parole officers, a judge, prosecuting attorney or any other court official, agents of the Alcoholic Beverage Control Division of the State Tax Commission, agents of the Bureau of Narcotics, personnel of the Mississippi Highway Patrol and the superintendent and his deputies, guards, officers and other employees of the Mississippi State Penitentiary; ... .
The word "murder" within this statute takes its meaning from Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1988) which reads:
(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
(a) When done with deliberate design to effect the death of the person killed, or of any human being.
[2] Miss. Code Ann. § 97-3-27 (1972):

The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.
[3] We would ordinarily refer to Deputy Sheriff Walter Bell as Deputy Bell or Officer Bell. To avoid confusion of his name with that of his cousin, Sheriff Osborne Bell, we refer to Deputy Bell in this opinion as Walter.
[4] Defendant's Instruction No. 6 reads:

The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter and not murder.
Section 97-3-35 M.C.A.
Defendant's Instruction No. 7 reads:
The chief difference between murder and manslaughter is the presence of deliberation and malice in murder and its absence in manslaughter. Carter v. State, 199 Miss. 871, 25 So.2d 470 (1946).
Defendant's Instruction No. 8 reads:
To establish one essential element of the offense of murder, the prosecution must prove beyond a reasonable doubt that the Defendant acted with premeditation and deliberation.
To premeditate means simply to think of the act before doing it. It means giving thought, before acting, to the idea of taking a human life, and reaching a definite decision to kill. In short, premeditation is the formation of a specific intent to kill.
"Deliberation" involves consideration and reflection upon the preconceived design to kill; turning it over in the mind; giving it a second thought. The mental process of deliberating requires that an appreciable time elapse between formation of the plan to kill and the fatal act. The law prescribes no particular period of time for deliberation. Consideration of a matter may continue over a prolonged period  hours, days, or even longer. Then again, it may confer but a brief pause and give a second thought and consideration to the intended act.
In other words, a typical killing with premeditation and deliberation is a murder committed in cold blood. A killing, even though intentional, committed on impulse or in sudden passion is generally without deliberation and therefore becomes manslaughter, unless the jury finds beyond a reasonable doubt that premeditation and deliberation, as I have defined those terms, did in fact occur.
Taylor v. State, 452 So.2d 441 (Miss. 1984). Sections 97-3-19, 97-3-35 M.C.A.
Defendant's Instruction No. D-10 reads:
The Court instructs the jury that if the jury can deduce from the facts and circumstances surrounding the case, either from the evidence or lack of evidence, any reasonable hypothesis consistent with the Defendant's guilt or a lesser offense than Capital Murder, then there is a reasonable doubt of his being guilty of Capital Murder, and the jury should return one of the following verdicts:
"We, the jury, find the Defendant not guilty of Capital Murder, but we do find the Defendant guilty of Manslaughter, in which case the Court shall sentence him as provided by law."
OR
"We, the jury, find the Defendant not guilty of Capital Murder, but we do find the Defendant guilty of Aggravated Assault, in which case the Court shall sentence him as provided by law."
Defendant's Instruction No. D-21 reads:
If you find that the Defendant had an apprehension that his life, or that his liberty was being illegally or unreasonably infringed upon, was in danger, even if this apprehension was unreasonable, then you must find that the Defendant's act was manslaughter and not murder. Cook v. State, 467 So.2d 203 (Miss. 1985).
[5] Nothing said here should be taken to suggest that being on a drug-induced high is any more of a defense to crime than being intoxicated. Cummings v. State, 465 So.2d 993, 995-96 (Miss. 1985); McDaniel v. State, 356 So.2d 1151, 1161 (Miss. 1978).
[6] If the other crime in which Mease may have been engaged in the commission of be a misdemeanor  as are several of those listed above, his would-be manslaughter offense would fall under Miss. Code Ann. § 97-3-29 (1972), our statutory misdemeanor-manslaughter rule, which reads:

§ 97-3-29. Homicide-killing while committing a misdemeanor.
The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any crime or misdemeanor not amounting to felony, or in the attempt to commit any crime or misdemeanor, where such killing would be murder at common law, shall be manslaughter.
The operative wording is identical to that found in Section 97-3-27. Because of this and because the facts suggest Mease may have been "engaged in the commission of" both felonies and misdemeanors, we proceed on the assumption that Section 97-3-27 furnishes the species of the genus manslaughter with which we need concern ourselves.
[7] Newell v. State, 308 So.2d 71, 78 (Miss. 1975).