## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CT-00564-SCT

*CLINTON WYATT NOLAN*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 03/05/2008 |
| TRIAL JUDGE: | HON. ROBERT P. CHAMBERLIN |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES D. FRANKS, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/12/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Clinton Wyatt Nolan shot and killed his father. In a bench trial before the DeSoto County Circuit Court, Nolan pleaded insanity as his defense. The circuit judge determined that Nolan was sane at the time of the shooting and found him guilty of heat-of-passion manslaughter. Nolan was thus sentenced to seven years in the custody of the Mississippi Department of Corrections and thirteen years of post-release supervision. His appeal was assigned to the Court of Appeals. The Court of Appeals held that there was sufficient evidence to support that Nolan was sane at the time of the homicide, but it found that there

was insufficient evidence to show that Nolan had acted in the heat of passion. The Court of Appeals, nevertheless, affirmed Nolan's conviction under our general manslaughter statute and remanded the case for resentencing under that statute. Unlike the Court of Appeals, we are persuaded that there was, in fact, sufficient evidence to support that Nolan shot his father in the heat of passion. We also find that there was sufficient evidence to show that Nolan was sane at the time of the homicide, and we decline Nolan's request that this Court abandon the *M'Naghten* rule as the test for insanity in this State. For these reasons, we reverse the judgment of the Court of Appeals and affirm the trial court's conviction and sentence for heat-of-passion manslaughter.

## FACTS AND PROCEDURAL HISTORY

¶2. The following is, in essence, a verbatim recitation of the facts as stated in the Court of Appeals' opinion. *Nolan v. State*, __ So. 3d __, 2010 WL 2043957 (Miss. Ct. App. May 25, 2010).

¶3. During the early morning hours of May 26, 2006, Nolan called 911 after shooting his father, Donald Nolan, in the chest in Hernando, Mississippi. Donald died shortly thereafter. In November 2006, Nolan was indicted by a grand jury for heat-of-passion manslaughter. Nolan waived his right to a jury trial. A bench trial was held on December 11, 2007, in which Nolan asserted an insanity defense.

¶4. At the beginning of the trial, the State and Nolan, through counsel, filed and entered into evidence a written Stipulation of Facts which stated, *inter alia*, that "Clinton Wyatt Nolan did on the 26th of May, 2006, in DeSoto County, Mississippi shoot and kill David Nolan, a human being, by the use of a dangerous weapon, to-wit: a handgun." The State then

2

rested its case-in-chief, reserving the right to call rebuttal witnesses after Nolan had presented his case-in-chief. Nolan moved for a directed verdict, which Judge Chamberlin denied.

¶5. Following the denial of his motion for a directed verdict, Nolan called seven witnesses, the first of whom was Dr. Robert Hoehn. Dr. Hoehn, who had been Nolan's psychiatrist since 1996, was qualified as an expert in the field of psychiatry. Dr. Hoehn testified that Nolan had been diagnosed with, and treated for, "Asperger's disorder" prior to coming under his care, and that he had treated Nolan for symptoms related to "anxiety, attention deficit, and depression." Dr. Hoehn stated that he had placed Nolan on several medications while Nolan was under his care. Dr. Hoehn testified that he had made modifications to Nolan's medication during the month before the shooting and that it appeared that Nolan had adjusted well. However, Nolan had become more depressed and anxious, prompting Dr. Hoehn to switch his medication from Paxil to Zoloft. Dr. Hoehn recalled that Nolan had seemed to be doing better when he had seen him approximately three weeks prior to the shooting. However, Dr. Hoehn stated that Nolan's family members had contacted him the week of the shooting and had informed him that Nolan seemed more upset, was more irritated, and had not been sleeping well. Dr. Hoehn testified that he then had prescribed Klonopin, which, Dr. Hoehn explained, is a tranquilizer that is used to treat sleep anxiety and agitation. Nolan killed his father within twenty-four hours of taking the Klonopin.

¶6. Dr. Hoehn testified that he had visited Nolan in the DeSoto County Jail on May 31, 2006, at which time Nolan had been "very psychotic." Dr. Hoehn explained that he meant that Nolan had been "unable to distinguish what was real and what wasn't." According to

3

Dr. Hoehn, Nolan had been confused and agitated. After the shooting, Dr. Hoehn had diagnosed Nolan with depressive-type schizoaffective disorder. He explained that schizoaffective disorder lies between bipolar disorder and schizophrenia. He also noted that hallucinations are a common symptom of schizoaffective disorder and that Nolan did not experience any hallucinations before the shooting. However, he pointed out that Nolan had experienced command hallucinations after the shooting. He defined a command hallucination as a voice that tells a person to do something. When asked whether he had an opinion as to whether Nolan understood the nature and quality of his actions at the time he shot his father, Dr. Hoehn stated:

> I think [Nolan] has always understood the facts of the case as it relates to that he shot his father. As far as, you know, what led to his making that decision, I think he was having very altered thinking. I don't think he was--I think he was delusional and psychotic, and I think, you know, that he wasn't in his right mind in terms of making decisions.

¶7. Dr. Hoehn concluded by saying that Nolan had never expressed to him that he had had command hallucinations on the night of the shooting. Dr. Hoehn stated that he thought that Nolan "was starting to have the beginnings of a psychotic episode the week before his dad died." Dr. Hoehn also stated that, after the shooting, Nolan was prescribed Seroquel, an antipsychotic drug.

¶8. Nolan posted bond and was released from jail. Dr. Hoehn explained that, following Nolan's release, Nolan was sent to Lakeside Behavioral Health System (Lakeside) in Memphis, Tennessee, for three months. According to Dr. Hoehn, Nolan showed improvement while at Lakeside. For example, Nolan's hallucinations diminished, and although he showed some agitation and frustration, his mood became more stable.

4

¶9. Next, Nolan called Dr. Joseph C. Angelillo, an expert in the field of forensic psychiatry. Dr. Angelillo had conducted an evaluation of Nolan a few weeks after the shooting to determine Nolan's mental status at the time of the shooting. At the time that he had conducted the interview, Nolan had been on Seroquel for two to three weeks and was "fairly lucid." Dr. Angelillo concluded that Nolan had not understood the nature and quality of his actions on the night of the shooting.

¶10. Margaret Cashion, a nurse who had worked at the DeSoto County Jail during Nolan's incarceration, testified that, while being housed in a holding cell on May 26, 2006, Nolan had become aggressive and agitated. According to Cashion, she was called to render assistance after Nolan struck an officer on the nose. Cashion testified that when she reached Nolan's cell, he was talking to a wall, and that she was told that he had been hitting his head against the wall prior to her arrival. Cashion stated that Nolan was allowed to speak with his mother after complying with Cashion's request to calm down. Cashion testified that she contacted Dr. Hoehn at some point thereafter and that he prescribed psychotropic medication which, in her opinion, positively affected Nolan's behavior.

¶11. In addition, several friends of the Nolan family testified on Nolan's behalf. Lynn Ford, who had visited Nolan on a daily basis while he was incarcerated, recalled that, during one visit, Nolan had asked her if she heard people talking, even though there was no one else in the room. Ron Donahoo had visited Nolan while Nolan was at Lakeside and described Nolan as being agitated and frustrated about the circumstances surrounding why he was there.

5

¶12. J. Hickman testified about a telephone conversation that he had had with Donald shortly before the shooting. According to Hickman, Donald told him that Nolan's condition had deteriorated, as Nolan had become agitated and was having trouble sleeping.

¶13. Like Ford, Hickman had visited Nolan while Nolan was incarcerated. According to Hickman, Nolan had been incoherent, agitated, confused, and fidgety. Nevertheless, he noted that Nolan had expressed remorse for his father's death, even though he did not indicate that he knew what had happened to his father.

¶14. James Wendell Sanders had lunch with Nolan and Donald on the day before the killing and testified that Nolan had been withdrawn and "was not acting like his normal self." Sanders noted that he had not seen Nolan in that state before.

¶15. The State then offered several rebuttal witnesses, including Commander Mark Blackson with the DeSoto County Sheriff's Department and clinical psychologist Dr. W. Criss Lott. Blackson interviewed Nolan on the morning of the shooting and testified regarding the interview. Blackson testified that Nolan had acknowledged shooting his father and that Nolan had expressed remorse for doing so. Blackson noted that the tape depicts an instance when the tape recorder was on and Nolan was talking, but he stopped abruptly and asked whether the recorder was on. Blackson answered affirmatively. Then, according to Blackson, Nolan became quiet and ceased talking. Blackson then turned the recorder off. Later, Blackson turned the recorder on again, and Nolan just looked at it and remained silent. Blackson then terminated the interview.

¶16. Dr. Lott, at the State's request, had interviewed Nolan one week before Nolan's trial. Dr. Lott was charged with providing a psychological assessment and an evaluation of Nolan's

mental state at the time of the killing. Dr. Lott had reviewed the following: (1) the transcript of Nolan's interview conducted by Blackson, (2) two psychological evaluations conducted in June 2006 by Drs. Angelillo and Robert Serino, (3) Dr. Hoehn's medical records, and (4) Nolan's medical records from Lakeside. Dr. Lott opined that Nolan had been mentally ill at the time of the shooting, but that his mental illness did not impact his ability to understand the nature and quality of his actions. According to Dr. Lott, he reached this conclusion because Nolan was very familiar with guns and was able to tell the 911 operator that he had shot his father with a .357 handgun. Dr. Lott surmised that Nolan "obviously knew that this was a gun, and that indicates to me that [he knew] nature and quality." Further, Dr. Lott testified that when Nolan had spoken with Dr. Hoehn two days after the shooting, Nolan had been clearly aware of what had transpired. Dr. Lott explained that, in his opinion, Nolan's mental illness did not "preclude his knowing that this is a gun, and if I shoot at someone, I'm going to hurt someone." Dr. Lott also testified that Dr. Hoehn had failed to explain how Nolan did not know what would happen if he pointed the gun and fired it at his father.

¶17.    In addition to his trial testimony, Dr. Lott sent a letter to the circuit court, in which he wrote the following:

> It is unclear to this examiner exactly what Mr. Nolan heard, as he gave inconsistent statements. He initially said that he could not recall what happened on the day of the offense, and did not spontaneously report hearing voices telling him to kill anyone, but his mother encouraged [him] to recall what happened, and concurred that he heard voices telling him to kill his father. It should be noted that the mother reported that he had not told anyone in the family that he was hearing voices regarding his father calling him names or voices telling him to kill his father. . . .
>
> Asked to describe what he was thinking and feeling on the day of the alleged offense, he said, "I was worried that my brain wasn't functioning right. I got

7

up, don't remember the time. My brain wasn't functioning. I heard voices telling me that my father said I was a sociopath. Voices said I had to go kill him. I picked up my pistol I had under my bed for self-defense. I decided to pick up the gun and shoot him. I went upstairs and shot him. He woke up and told me to call 911 and I did. I was in a strange state when I shot him. I wasn't sure what to do, confused. I told the police what happened and let them arrest me. They put my dad in the ambulance. In jail, it was weird. I was in a strange hyper-manic state. There was a buzzing sound in my head. I was hallucinating. I was communicating with family through cinder block walls.

¶18. On cross-examination, Dr. Lott conceded that someone who had evaluated Nolan closer to the time of the incident would have a better assessment of Nolan's mental state but noted that "no one assessed the issue of insanity" after the shooting. He also noted that there was no documentation supporting the notion that Nolan had been hearing command hallucinations when he shot his father.

¶19. Following the trial, the circuit court concluded that Nolan was sane at the time of the shooting and convicted him of heat-of-passion manslaughter. *Nolan*, 2010 WL 2043957, at **1-4.

¶20. Before the Court of Appeals, Nolan asserted that: (1) the trial court had erred in failing to grant Nolan's motion for directed verdict; (2) the trial court had erred in finding that the State had proven beyond a reasonable doubt that Nolan was sane at the time of the shooting; and (3) that the *M'Naghten* Rule[1] should be replaced. *Nolan*, 2010 WL 2043957, at *1. The Court of Appeals found that the State did not produce sufficient evidence to support a conviction of heat-of-passion manslaughter, but found that the facts supported a conviction

---

[1] *M'Naghten's Case*, 10 Clark & F. 200, 210, 8 Eng. Rep. 718, 722 (1843).

of manslaughter under Mississippi Code Section 97-3-47 (Rev. 2006) and thus upheld Nolan's sentence. *Nolan*, 2010 WL 2043957, at *1.

¶21.    Nolan then filed this petition for writ of certiorari, in which he asserts: (1) that the Court of Appeals erred in converting his heat-of-passion manslaughter conviction to a conviction under our general manslaughter statute; (2) that the *M'Naghten* Rule should be replaced in Mississippi; and (3) that the Court of Appeals erroneously upheld the trial court's determination that Nolan was sane at the time of the shooting.

## DISCUSSION

### I.    The evidence was sufficient to sustain Nolan's conviction for heat-of-passion manslaughter under Section 97-3-35.

¶22.    Before the Court of Appeals, Nolan argued that the State did not present any evidence to show that he had acted in the heat of passion, and, therefore, the trial court erred in finding that there was sufficient evidence to support a conviction of heat-of-passion manslaughter. *Nolan*, 2010 WL 2043957, at *1. The Court of Appeals agreed that there was insufficient evidence to convict Nolan of heat-of-passion manslaughter, but found that the evidence was sufficient to convict him of culpable-negligence manslaughter under Section 97-3-47. *Nolan*, 2010 WL 2043957, at *9.

¶23.    We need not address the propriety of the Court of Appeals' decision to convert Nolan's heat-of-passion manslaughter conviction to a general manslaughter conviction, because we find that there was sufficient evidence to show that Nolan acted in the heat of passion.

9

¶24. In reviewing a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). The evidence will be deemed sufficient if, bearing in mind the reasonable-doubt standard, "reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense . . . ." *Bush*, 895 So. 2d at 843 (citing *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)).

¶25. The indictment charged that Nolan "did wilfully, unlawfully and feloniously, kill one Donald Nolan, a human being, without malice, in the heat of passion, by the use of a dangerous weapon, to-wit: a handgun, without authority of law and not in necessary self-defense, in violation of Section 97-3-35 . . . ." Section 97-3-35, in turn, defines manslaughter as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense . . . ." Miss. Code Ann. § 97-3-35 (Rev. 2006).

¶26. This Court has defined "heat of passion" as:

> [A] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Tait v. State*, 669 So. 2d 85, 89 (Miss. 1996) (quoting *Buchanan v. State*, 567 So. 2d 194, 197 (Miss. 1990)).

¶27.   The Court of Appeals concluded that, even though Nolan had told the 911 dispatcher that he had "acted out of emotion," there was nothing in the record to show that Donald had provoked Nolan with words or acts at the time of the shooting.  The record, however, indicates that Nolan was angry with his father for calling him a sexual deviant or something of the like.  In his psychological evaluation of Nolan, Dr. Angelillo suspected that Nolan's "hallucinations and delusions had to do with [Donald] talking about [Nolan] being a sexual abuser, perpetrator, pervert, etc."  And, after visiting Nolan in jail, Dr. Hoehn noted that Nolan was "somewhat tangential in his thinking and seemed to imply that his father had intimated he was a perpetrator."  Dr. Lott, in his assessment of Nolan, determined that:

> [I]t is unclear to this examiner when, and if, he heard voices telling him to kill his father, as there was nothing in the medical records that indicated that he was hearing voices telling him to kill his father.  It appears that there had been a previous conversation with the father regarding in inappropriate sexual behavior by Mr. Nolan (based on Dr. Hoehn's notes), and Mr. Nolan became fixated on the belief that his father, and possibly a professor, was stating that he was a sexual deviant, and his father hated him.  It is unclear to this examiner if Mr. Nolan was experiencing auditory hallucinations, or if he was ruminating excessively, in more of an obsessive compulsive manner, and he was angry with the father for calling him a sexual deviant.

¶28.   Considering this evidence, it appears that a reasonable fact-finder could have found that Donald had made certain statements that had provoked Nolan's actions.  The question then, of course, is whether the provocation could have been found immediate and reasonable.

¶29.   Donald was asleep immediately prior to the shooting, and it is unclear when precisely he made the sexual-deviant comments to Nolan.

11

¶30.    Issues surrounding immediacy, i.e., whether a sufficient "cooling off" period has passed between the provocation and the killing so as to negate that the crime occurred in the heat of passion, are questions of fact. *Hartfield v. State*, 186 Miss. 75, 189 So. 530, 532 (1939); *Haley v. State*, 123 Miss. 87, 85 So. 129, 131 (1920) (quoting 1 *Wharton's Criminal Law* (10th ed.) ¶ 480). This Court long ago stated that such questions must be resolved based upon the specific facts of the case and the conditions or temperment of the defendant. *Haley*, 85 So. at 131-32.

¶31.    In *Haley*, the defendant was indicted for murdering a man in the waiting room of a train station. *Id.* at 129. Two days earlier, the defendant's wife had confessed that she and the victim had committed adultery. *Id.* at 130. And the day before the shooting, the defendant's wife had informed him that the victim had boasted of having "illicit relations" with the defendant's adult daughter. *Id.* Witnesses' testimony established that the news had enraged the defendant, and that he had not eaten or slept from the time that he learned of the adultery until the homicide. *Id.* His sole defense at trial, like the case before us, was insanity. *Id.* at 129. The jury ultimately convicted the defendant of heat-of-passion manslaughter. *Id.* This Court, despite a two-day passage of time between the provocation and the killing, affirmed the conviction. *Id.* at 130-34. The Court reasoned that there is no fixed period of time for cooling, and that such questions depend upon the circumstances and, sometimes, the temperment of the defendant. *Id.* at 132. The Court found that: "All of the testimony for the defendant in the present case tends to show that the defendant was in a constant state of agitation from Monday night until Wednesday afternoon, and acted under great excitement at the time he fired the shot." *Id.* Notably, the Court added that, even

12

though most of the evidence concerning defendant's state of mind had been introduced for the issue of insanity, "its necessary effect was to establish the existence of passion, or at least to warrant the jury in finding that the unlawful act was done in the heat of passion." *Id.*

¶32. The evidence in this case showed that Nolan had become obsessed with the notion that he had been accused of being a sexual deviant. Dr. Lott described Nolan as being "angry with [his] father for calling him a sexual deviant." According to Dr. Angelillo, Nolan was "particularly vulnerable" to such accusations, because Nolan had been sexually molested earlier in life. There was testimony that Nolan had not slept in the days leading up to the shooting. The day before the shooting, Nolan was described as being "withdrawn inside himself" and "disturbed." Furthermore, he said that he "acted out of emotion," and that he "couldn't control this [the shooting]."

¶33. Given the facts of this case, we find that there was sufficient evidence that, in the days preceding the shooting, Nolan was in a constant state of agitation, predicated upon his father's comments regarding his sexuality. Nolan, moreover, was said to be especially sensitive to such statements because of earlier life experiences. Accordingly, we find that a reasonable fact-finder could have found that Nolan had acted in the heat of passion.

## II. Sufficient evidence existed to conclude that Nolan was sane at the time of the shooting.

¶34. The Court of Appeals found that Nolan's sanity at the time of the shooting was a question of fact, that there was conflicting expert testimony on the subject, and that the circuit judge had the prerogative to accept the testimony of the State's expert as opposed to Nolan's experts. *Nolan*, 2010 WL 2043957, at *7. We agree.

13

¶35. Mississippi follows the *M'Naghten* standard for determining whether a defendant was sane at the time of the crime. *Hearn v. State*, 3 So. 3d 722, 738 (Miss. 2008) (citing *Woodham v. State*, 800 So. 2d 1148, 1158 (Miss. 2001)). To be deemed insane under the *M'Naghten* test, the defendant must be "'laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong.'" *Hearn*, 3 So. 3d at 738 (quoting *Woodham*, 800 So. 2d at 1158). The opinions of experts and lay witnesses frequently are used to establish an accused's mental state. *Edwards v. State*, 441 So. 2d 84, 86-87 (Miss. 1983). The determination of sanity is within the province of the fact-finder, typically a jury or a circuit judge in a bench trial. *Hearn*, 3 So. 3d at 738 (citing *Woodham*, 800 So. 2d at 1158).

¶36. A defendant is presumed to be sane until some reasonable doubt of sanity arises. *Hearn*, 3 So. 3d at 738 (citing *Roundtree v. State*, 568 So. 2d 1173, 1181 (Miss. 1990)). Once reasonable doubt of sanity is created, the State must prove the defendant's sanity beyond a reasonable doubt. *Hearn*, 3 So. 3d at 738 (citing *Roundtree*, 568 So. 2d at 1181).

¶37. At the very beginning of the 911 call, Nolan informed the dispatcher that "I got a GSW to the body." When the operator asked Nolan who shot the man, Nolan said, "I did." After giving the operator his full name, Nolan commented, "I can't believe I did that." He later told the dispatcher that he had "acted out of emotion" when he shot his father. He also told the dispatcher that he had shot his father with a ".357 Sig." Shortly thereafter, Donald got on the telephone and spoke to the 911 dispatcher. The dispatcher asked Donald why Nolan had shot him, and Donald responded that "[Nolan] was having (unintelligible)

14

problems." Donald told the dispatcher that Nolan "is having an episode because his medicine is messed up."

¶38. The circuit judge found that the State had proven beyond a reasonable doubt that Nolan was sane at the time of the shooting. Nothing, he said, contradicted that Nolan "knew the nature and the quality of his physical acts and the physical consequences of [his] acts." He concluded further that Nolan knew that what he was doing was wrong. In making his determination, the circuit judge found the 911 tape particularly convincing:

> I find that the greater weight of the evidence and the evidence which shows beyond a reasonable doubt that Mr. Nolan was in fact sane at the time of the crime, the most telling piece of evidence is the 911 tape. I find that Mr. Nolan was extremely lucid and logical on the tape, clearly expressed with no problem what had happened, using forensic terminology, was able to convey at the request of his dying father what type of weapon had been used, certainly showed emotional outburst and remorse during the 911 conversation. There is nothing the Court finds about the 911 conversation or any evidence that has been presented to this Court prior to that 911 conversation that would indicate Mr. Nolan not to know the nature and quality of his actions and that those actions would have been wrong.

> I do not have the luxury of relating back Mr. Nolan's grossly psychotic appearance the next day in the DeSoto – or later that day, I suppose, in the DeSoto County Jail relating that back to the specific moment that he chose to and did in fact shoot and kill his father; but to the extent those determinations have to be made, certainly I find the 911 tape moments after the shooting to be the most important piece of evidence in that regard.

> Certainly, I will note, certainly Mr. – as required by the law and noted throughout jurisdiction and jurisdiction, certainly Mr. Nolan's statements of remorse are also evidentiary in that regard; but the witnesses who testified regarding Mr. Nolan's appearance within days after the shooting, I certainly heard nothing that would make me dispute anything those witnesses testified to. However, those are not or that is not the evidence as to the mental state of Mr. Nolan at the time of shooting and certainly nothing before that time indicates that he did not know the nature and quality and wrongfulness of his actions, and certainly the 911 tape would go against any claim that he did not.

15

The Court finds that Mr. Nolan and finds beyond a reasonable doubt that Mr. Nolan did in fact act out of emotion and in the heat of passion in the killing of Donald Nolan and is in fact guilty of the charge of manslaughter as set forth in the indictment. . . .

¶39. Sufficient evidence existed in this case to determine that Nolan was sane at the time of the shooting. Though Dr. Lott conceded that Nolan's behavior was related to his mental illness, he opined that Nolan recognized the wrongfulness of his actions based upon Nolan's coherent conversation with the 911 dispatcher. The circuit judge had the right to rely upon Dr. Lott's expert opinion and not the opinions of Drs. Hoehn and Angelillo.

### III. This Court elects not to abandon or modify its longstanding adherence to the *M'Naghten* Rule.

¶40. Nolan argues that this Court should abandon the *M'Naghten* standard. We decline to do so.

¶41. Other appellants previously have urged this Court to abandon the *M'Naghten* standard. *Burk v. State*, 506 So. 2d 993, 993 (Miss. 1987); *Hill v. State*, 339 So. 2d 1382 (Miss. 1976); *Jones v. State*, 288 So. 2d 833, 834 (Miss. 1974). This Court has refused to do so in each instance. *Burk*, 506 So. 2d at 993; *Hill*, 339 So. 2d at 1385; *Jones*, 288 So. 2d at 834. In *Hill*, the Court acknowledged that *M'Naghten* is not perfect; nevertheless, it found *M'Naghten* to be the safest means of testing criminal responsibility. *Hill*, 339 So. 2d at 1385.

### CONCLUSION

¶42. We find that there was sufficient evidence to conclude that Nolan was sane when he shot his father, and that Nolan did so in heat-of-passion manslaughter. Additionally, we decline to abandon the *M'Naghten* rule as the test for insanity in this State. We therefore

16

reverse the judgment of the Court of Appeals and affirm the trial court's conviction and sentence of Nolan for heat-of-passion manslaughter.

¶43.  **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED.  THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY IS AFFIRMED. CONVICTION OF MANSLAUGHTER AND SENTENCE OF SEVEN (7) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND THIRTEEN (13) YEARS OF POST-RELEASE SUPERVISION, WITH FIVE (5) YEARS REPORTING AND EIGHT (8) YEARS NON-REPORTING, AFFIRMED.**

**LAMAR AND PIERCE, JJ., CONCUR.  RANDOLPH, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J.   CARLSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KITCHENS, J.   KING, J., NOT PARTICIPATING.**

**RANDOLPH, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶44.  I concur with the plurality on the second and third issues.  Regarding the first issue, I concur in reversing the Court of Appeals' judgment and affirming the trial court's judgment for reasons that differ from those of the plurality.

¶45.   The plurality sets out Issue I as whether "[t]he evidence was sufficient to sustain Nolan's conviction for heat-of-passion manslaughter under Section 97-3-35." Alternatively, it could have stated: Whether the evidence was sufficient to sustain Nolan's conviction for manslaughter with a dangerous weapon under Section 97-3-35.

¶46.   A grand jury indicted Nolan for having willfully, unlawfully, and feloniously killed "a human being, without malice, in the heat of passion, by the use of a dangerous weapon, to wit: a handgun, without authority of law and not in necessary self defense . . . ."  Our ruling also could have been predicated on finding the heat-of-passion language extraneous to the indictment, for that element is inextricably linked by the commands of our language

17

and proper grammar to the element that follows it, "*but* in a cruel or unusual manner . . . ." Miss. Code Ann. § 97-3-35 (Rev. 2006) (emphasis added). The indictment was never contested in the trial court. The only issue contested at trial was Nolan's sanity. The trier of fact concluded that Nolan was sane and guilty of manslaughter.

¶47. This Court has held that the language of the statute may be read in the disjunctive.[2] *Lanier v. State*, 684 So. 2d 93, 97 (Miss. 1996). Under a disjunctive reading, heat of passion would be a necessary element only to a cruel-or-unusual-manner charge, but would not be necessary to dangerous-weapon manslaughter. Under such a charge, the elements are: (1) killing of a human being, (2) without malice, (3) by the use of a dangerous weapon, (4) without authority of law, and (5) not in necessary self-defense. *See* Miss. Code Ann. § 97-3-35 (Rev. 2006).

¶48. A reading of an earlier *Lanier* decision reveals that this Court has examined the question of whether heat of passion is a necessary element of dangerous-weapon manslaughter under Mississippi Code Section 97-3-35, and has conclusively found a trial court in error for failing to give a manslaughter instruction that did **not** include heat of passion. *Lanier v. State*, 450 So. 2d 69, 83 (Miss. 1984)). This Court reversed Lanier's conviction, finding error in refusing instruction D-10, the final paragraph of which follows:

---

[2]Definition of "disjunctive": "1. Serving to divide or separate. 2. Serving to establish a relationship of contrast or opposition . . . . 3. *Logic.* a. Of a proposition that presents two or more alternative terms." *Webster's II New College Dictionary* 327 (1995). This is opposed to "conjunction": "One of the parts of speech in some languages comprising such words as, in English, *and*, *but*, *because*, and *as*, that connect other words, phrases, clauses, or sentences." *Id.* at 238.

18

> If you find beyond a reasonable doubt that Arthur Ray Lanier killed Buford Dedeaux, a human being, without malice but by his own action by the use of a deadly weapon, without authority of law, and not necessarily in self-defense, then you shall find the defendant, Arthur Ray Lanier, guilty of the crime of manslaughter.

*Lanier*, 684 So. 2d at 95 (quoting *Lanier*, 450 So. 2d at 83). A dissenting justice in the earlier *Lanier* case unsuccessfully argued that there was no error in refusing this instruction, as a proper instruction required "in the heat of passion." *See Lanier*, 450 So. 2d at 83 (Bowling, J., joined by Roy Noble Lee, and Walker, P.JJ.) Justice Bowling's dissent included the following discussion:

> The refused Instruction D-10 completely omitted an essential requirement[] of the statute; that is, that in addition to the killing being without malice, it absolutely required that it be "in the heat of passion." There is an alternative in the statute wholly disconnected with the requirement that the killing be "without malice in the heat of passion;" and that is that it can either be "in a cruel or unusual manner" or "by the use of a dangerous weapon without authority of law and not in necessary self-defense."
>
> It is therefore inescapable that assuming appellant to have been entitled to a manslaughter instruction, the submitted D-10 was erroneous and properly refused. It did not require an essential element of manslaughter, statutorily required; that is, without malice, *in the heat of passion*.

*Id.* (emphasis in original). The *Lanier* majority rejected this argument without comment. *Id.* at 79-81. In the later *Lanier* opinion, the Court followed the earlier ruling and stated succinctly that it was reversible error to grant a heat-of-passion instruction where all agreed there was no proof of heat of passion, but the trial court erred in refusing the same D-10 instruction approved in the prior-named case:

> We agree with Lanier that the statute may be read in the disjunctive and that the killing of a human being without malice, or by the use of a dangerous weapon without authority of the law and not in necessary self-defense, may be manslaughter. In the present case, it was reversible error to grant a heat of

19

passion manslaughter instruction where all parties agreed there was no proof of heat of passion. Further, the trial court erred in refusing Instruction D-10 because the facts of this case warrant this instruction. This is the very ground upon which this Court reversed in the first trial.

*Lanier*, 684 So. 2d at 97. Thus, there is clear and unequivocal precedent for affirming Nolan's conviction under Section 97-3-35 without a heat-of-passion finding.

¶49. I can only surmise that the belief that heat of passion always is a necessary element under this statute has arisen from long-term, undue attention to the statute's heading: "Homicide; killing without malice in the heat of passion." Miss. Code Ann. § 97-3-35 (Rev. 2006). This heading does not have the force of law. "Headings or 'catchlines' for Code sections and subsections are generally created and maintained by the publisher. They are mere catchwords and are not to be deemed or taken as the official title of a section or as a part of the section." Mississippi Code 1972 Annotated, User's Guide, at xii (Rev. 2005). If we followed the statutory language, an affirmance of the conviction would be in order without the heat-of-passion debate between the plurality and dissenting opinions.

¶50. Finally, the dissent's assumption that heat of passion is a necessary element is flawed because it requires an illogical assumption – that the Legislature, in creating ten specific manslaughter statutes and one general statute, would require a prosecutor to prove heat of passion for this type of manslaughter. In a case without heat of passion, resort to the general manslaughter statute would be inappropriate, as that statute, being tied historically to common-law involuntary manslaughter, does not require intent. *See Craig v. State*, 520 So. 2d 487, 491 (Miss. 1988); *Miller v. State*, 733 So. 2d 846, 849-50 (Miss. Ct. App. 1998); Miss. Code Ann. § 97-3-47 (Rev. 2006). This would mean that an intentional (but not an in-

the-heat-of-passion) killing of a human being with a dangerous weapon is not prohibited under our eleven-section manslaughter statutory system. As none of the other manslaughter statutes requires heat of passion, it would be illogical to treat intentional homicide with a dangerous weapon differently. Our Court has stated repeatedly that heat of passion is not a necessary element in the disjunctive option of Section 97-3-35.

¶51. I would find separately that the evidence was sufficient to affirm Nolan's conviction for dangerous-weapon manslaughter under Section 97-3-35.

**CHANDLER, J., JOINS THIS OPINION.**

**CARLSON, PRESIDING JUSTICE, DISSENTING**:

¶52. The plurality finds that there is sufficient evidence to show that Clinton Wyatt Nolan shot his father in the heat of passion. With the utmost respect, I find that the evidence in the record does not show that Nolan acted in the heat of passion when he shot and killed his father. Therefore, for the reasons discussed below, I dissent.

¶53. The plurality finds that Nolan acted in the heat of passion because he stated that he had "acted out of emotion," and because there is evidence in the record showing that Nolan was angry with his father for allegedly calling him a sexual deviant. Respectfully, I find that this is not sufficient evidence to support a heat-of-passion manslaughter conviction under Mississippi Code Section 97-3-35 (Rev. 2006).

¶54. We have defined heat of passion as:

[A] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger *suddenly aroused* at the time by some *immediate and reasonable provocation*, by words or acts of one at the

21

> time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Tait v. State*, 669 So. 2d 85, 89 (Miss. 1996) (quoting *Buchanan v. State*, 567 So. 2d 194, 197 (Miss. 1990)) (emphasis added).

¶55. The plurality relies on *Haley v. State*, 123 Miss. 87, 85 So. 129, 131-32 (1920), for the proposition that questions of provocation and "cooling off" periods are "resolved based upon the specific facts of the case and *the conditions or temperament of the defendant*." Plur. Op. ¶ 30 (emphasis added). Admittedly, the more than ninety-years-old *Haley* opinion does stand for this proposition. *Haley*, 85 So. at 131-32. Although *Haley* has never been expressly overruled, this Court's subsequent caselaw does not support *Haley*'s – or the plurality's – proposition.

¶56. For example, in *Taylor v. State*, 452 So. 2d 441, 448 (Miss. 1984), this Court found that the issue of heat of passion is an objective assessment. *See also Moody v. State*, 841 So. 2d 1067, 1097 (Miss. 2003) (The question of whether the defendant acted in the heat of passion "is an objective one, being whether a reasonable person would have been so provoked."); *Keys v. State*, 33 So. 3d 1143, 1148 (Miss. Ct. App. 2009) ("[T]he determination of whether the defendant acted in the heat of passion and without malice is an objective question. That question is whether a reasonable person would have been so provoked."); *Dabney v. State*, 772 So. 2d 1065, 1069 (Miss. Ct. App. 2000) ("[T]he question of whether the accused has acted in the heat of passion is to be resolved by utilization of an objective standard. . . . . The standard presupposes an individual without serious mental and emotional defects.").

¶57. In today's case, Nolan entered his father's bedroom and shot him while he was asleep in bed. Nolan apparently was upset with his father because he was under the impression that his father thought he was a sexual deviant. I find that these facts do not support a heat-of-passion manslaughter conviction. The provocation in today's case – the allegation that Nolan's father thought he was a sexual deviant – would not cause a *reasonable person* to enter a state of violent and uncontrollable rage. Further, even if Nolan had been enraged by this, there was an adequate time for Nolan to "cool off." While we do not know exactly when Nolan first became aware of his father's alleged opinion of him, we do know that enough time had passed to allow Nolan's father to fall asleep in his bedroom.

¶58. We previously have held that, under facts similar to those before us today, there was no evidence in the record to support a heat-of-passion manslaughter conviction. ***Greenlee v. State***, 725 So. 2d 816, 823 (Miss. 1998). In ***Greenlee***, the defendant, Aaron Greenlee, and his mother, Shelia Greenlee, had an argument about Aaron using the family vehicle to go to the fair with some of his friends. ***Id.*** at 819. After the argument ended, Shelia fell asleep on the couch in the living room, and Aaron allegedly took three hits of LSD. ***Id.*** Aaron then took a rifle from his mother's bedroom, walked into the living room where his mother was sleeping, and fatally shot his mother in the head. ***Id.*** Aaron was convicted of murder and, on appeal, argued that the trial court had erred in refusing to grant a manslaughter instruction. ***Id.*** This Court found that the trial court did not err in refusing the instruction, stating that:

> . . . Shelia Greenlee was asleep when her son shot her in the head. Thus, even if there was an argument between Greenlee and his mother, enough time had passed for him to go to his room, to allegedly take three hits of acid, the drugs to take effect, walk into his mother's room to retrieve his gun, walk back to his

23

room, load the gun with two bullets, walk back into the living room *where sufficient time had passed for this mother to fall asleep*, aim the gun at her head and shoot. The jury could only have returned a verdict for manslaughter by finding affirmatively that Greenlee acted without deliberate design and in the heat of passion, matters with respect to which there was *no evidentiary basis in the record*. 'Such matters may not be inferred.'

Upon reviewing the evidence in this case, it is clear to this Court that the manslaughter instruction which was tendered by Greenlee should not have been given. There is simply no evidence in the case – offered by the State or by the defense – which would change the character of the killing so that a reasonable jury could affirmatively find that the killing of Shelia Greenlee was manslaughter.

*Id.* at 823 (citations omitted) (emphasis added).

¶59. Our holding in *Greenlee* is consistent with the premise that there must be an *immediate and reasonable provocation* to support a heat-of-passion manslaughter conviction. *See Neal v. State*, 15 So. 3d 388, 408-09 (Miss. 2009) (finding no evidence that the defendant acted upon an immediate and reasonable provocation when the defendant was suspicious "for some time" that the victim had been unfaithful to him); *Smith v. State*, 20 So. 3d 12, 15 (Miss. Ct. App. 2009) (defendant "was not entitled to claim that he was still in the heat of passion over events that happened the day before"); *Alford v. State*, 5 So. 3d 1138, 1143 (Miss. Ct. App. 2008) ("[E]ven if a past argument could be inferred between" the defendant and the victim to explain the defendant's animosity toward the victim, this is "insufficient to satisfy the heat-of-passion element of manslaughter, as the provocation must be immediate – that is, occurring at the time of the killing.").

¶60. Because Nolan was not immediately and reasonably provoked by his sleeping father, I respectfully disagree with the plurality's finding that there is sufficient evidence to support Nolan's heat-of-passion manslaughter conviction. Because I disagree with the plurality on

24

this point, I will continue my discussion and consider whether the Court of Appeals correctly converted Nolan's heat-of-passion manslaughter conviction to general manslaughter under Mississippi Code Section 97-3-47 (Rev. 2006).

¶61.   Before the Court of Appeals, Nolan argued that the trial court had erred in finding that there was sufficient evidence to support a conviction of heat-of-passion manslaughter, because the State did not present any evidence showing that Nolan had acted in the heat of passion.  *Nolan v. State*, 2010 WL 2043957 at \*1, ¶1.

¶62.   Mississippi Code Section 97-3-35 (Rev. 2006) states:

> The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.

¶63.   Thus, the express language of the statute, which may be read in the disjunctive,[3] provides two options by the State concerning an indictment under this statute: (1) A person may be indicted for the killing of a human being, without malice, in the heat of passion, *but in a cruel or unusual manner*, without authority of law, and not in necessary self-defense; or (2) A person may be indicted for the killing of a human being, without malice, in the heat of passion, *by the use of a dangerous weapon*, without authority of law, and not in necessary self-defense.

---

[3]*Lanier v. State*, 684 So. 2d 93, 97 (Miss. 1996).  Also, this Court, in *Lanier*, was confronted with the familiar issue of whether, in a capital-murder case, the trial court erred in refusing to give a lesser-offense instruction under one of our manslaughter statutes. However, in our case today, Nolan was *indicted* for manslaughter. The State elected to proceed under the portion of the manslaughter statute which involves a killing with the use of a dangerous weapon as opposed to a killing in a cruel or unusual manner.

¶64.   In today's case, the State chose to present this matter to the DeSoto County Grand Jury via option two. The indictment states in pertinent part:

> That **CLINTON WYATT NOLAN**, Late of the County and State aforesaid, on or about the **26th** day of **May**, in the year of our Lord, **2006**, in the County and State aforesaid, and within the jurisdiction of this Court, did wilfully, unlawfully and feloniously, kill one Donald Nolan, a human being, without malice, in the heat of passion, by the use of a dangerous weapon, to-wit: a handgun, without authority of law and not in necessary self-defense, in violation of Section 97-3-35, Mississippi Code 1972 Annotated, as amended, contrary to the form of the statute in such cases provided and against the peace and dignity of the State of Mississippi.

As discussed above, we have defined heat of passion as:

> [A] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Tait*, 669 So. 2d at 89 (quoting *Buchanan*, 567 So. 2d at 197).

¶65.   The Court of Appeals found that, although there was not sufficient evidence to convict Nolan of heat-of-passion manslaughter, there was sufficient evidence to convict Nolan of culpable-negligence manslaughter under Mississippi Code Section 97-3-47. *Nolan*, 2010 WL 2043957, at *9, ¶32. This "catch-all," or general-manslaughter, statute states: "Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter." Miss. Code. Ann. § 97-3-47 (Rev. 2006). Importantly, Nolan was not indicted under Section 97-3-47.

26

¶66.   Even though Nolan was not indicted for committing the crime referred to as general manslaughter, the Court of Appeals found that, under our ruling in *Tait v. State*, 669 So. 2d 85 (Miss. 1996), Nolan could be convicted of manslaughter under Section 97-3-47.  I disagree and proceed now to explain why.

¶67.   In *Tait*, this Court found that, although the evidence did not support the defendant's depraved-heart murder conviction, the evidence supported a conviction of culpable-negligence manslaughter.  *Tait,* 669 So. 2d at 87.  This Court remanded the case to the lower court for resentencing only.  *Id.* at 91.  Citing *Clemons v. State*, the *Tait* Court reasoned that "it would serve no useful purpose to subject the state and the defendant to another trial for manslaughter when the evidence has established guilt of that crime beyond a reasonable doubt."  *Tait*, 669 So. 2d at 91 (quoting *Clemons v. State*, 473 So. 2d 943, 945 (Miss. 1985)).  Importantly, in *Tait,* this Court reduced the conviction of depraved-heart murder to a conviction of a lesser-included offense – culpable-negligence manslaughter.  *See State v. Shaw*, 880 So. 2d 296, 304 (Miss. 2004) (citations omitted) ("Manslaughter is a lesser-included offense of murder.").

¶68.   The rationale in *Tait* is codified in Mississippi Code Section 99-19-5(1) (Rev. 2007), which states in part: "On an indictment for any offense the jury may find the defendant guilty of the offense as charged, . . .  or may find him guilty of an inferior offense . . . ."  Section 2 of the statute states that "manslaughter shall be considered a lesser included offense of murder and capital murder."  Miss. Code Ann. § 99-19-5(2) (Rev. 2007).

¶69.   In today's case, however, we are not considering a reduction of a murder conviction to manslaughter.  Nolan was indicted for, and convicted of, heat-of-passion manslaughter.

27

However, the Court of Appeals found that the evidence was legally insufficient to sustain a conviction for that crime, but that there existed in the record sufficient evidence which supported a conviction of general manslaughter. *Nolan*, 2010 WL 2043957, at **1, 9, ¶¶3, 32. Thus, the inquiry today is whether general manslaughter as defined under Mississippi Code Section 97-3-47 (Rev. 2006) is a lesser-included offense of heat-of-passion manslaughter under Mississippi Code Section 97-3-35 (Rev. 2006).

¶70. A defendant's right to be informed of the charges against him must be in the forefront of this analysis. Miss. Const. art. 3, § 27 (1890); *see Woods v. State*, 200 Miss. 527, 27 So. 2d 895 (1946). It must also be considered that, when a defendant is indicted for a particular crime, he also stands charged with all inferior crimes that necessarily are included in the greater charge. Miss. Code Ann. § 99-19-5(1) (Rev. 2007).

¶71. A lesser-included offense "is one in which all the essential ingredients are contained in the offense for which the accused is indicted. Therefore, by its very definition, a defendant is always on notice of a lesser-included offense. In other words, the superior offense cannot be committed without the lesser-included offense being committed." *Wallace v. State*, 10 So. 3d 913, 917 (Miss. 2009) (internal citations and quotations omitted).

¶72. This Court has never addressed whether general manslaughter is a lesser-included offense of heat-of-passion manslaughter. Our heat-of-passion manslaughter statute, Mississippi Code Section 97-3-35, states: "The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." Section 97-3-47 – our general manslaughter statute – states: "Every other killing of a human being,

28

by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter." Miss. Code Ann. § 97-3-47 (Rev. 2006).

¶73. The Court of Appeals in *Miller v. State* discussed the differences between these two crimes, stating that:

> The common law recognized two basic forms of manslaughter. One was called voluntary manslaughter and involved the situation where the defendant purposely took the life of his victim, not without premeditation, but upon a sudden provocation sufficient to incite the defendant's passion. Wayne R. Lafave and Austin W. Scott, Jr., Handbook on Criminal Law § § 75-76 (1972). This "heat of passion" manslaughter is essentially codified in Mississippi Code of 1972 Section 97-3-35.
>
> The other form of common law manslaughter was termed involuntary manslaughter, which was designed to criminally punish a defendant whose actions caused the death of another in certain circumstances, even though the defendant had no intention or design to effect a death. Under the common law, involuntary manslaughter arose in two broad general circumstances. The first was where the defendant was committing an illegal act not amounting to a felony that caused a death, though the killing was not intended and the act was one that, in the ordinary course of events, would not reasonably be expected to produce death. The second was when the defendant was engaged in activity of a degree of negligence of such gravity as to be termed criminal negligence or culpable negligence and the culpably negligent activity caused the death of another.

*Miller v. State,* 733 So. 2d 846, 849-50 (Miss. Ct. App. 1998). Further, we have held that Section 97-3-47 is the statutory form of common-law involuntary manslaughter. *Craig v. State*, 520 So. 2d 487, 491 (Miss. 1988).

¶74. I find that the reasoning of the Court of Appeals in *Miller* is sound and also applicable to today's case. Based on *Miller,* I find that a person may commit heat-of-passion manslaughter without necessarily committing the crime of general manslaughter. Thus, general manslaughter under Section 97-3-47 is not a lesser-included offense of heat-of-

29

passion manslaughter. Heat-of-passion manslaughter, although committed through sudden provocation, requires that the defendant act with *intent*. General manslaughter does not require intent, but rather includes theories of accident or negligence. One may intentionally kill without acting accidentally or negligently. Stated differently, if a person intends to kill another, the killer does not act accidentally or negligently. Heat-of-passion manslaughter and general manslaughter carry with them two distinct states of mind, each exclusive of the other. Thus, the superior offense – in this case heat-of-passion manslaughter – may be committed without necessarily committing general manslaughter.

¶75. Our manslaughter statutes support this contention. The Mississippi Legislature has enacted eleven manslaughter statutes, each concerning different elements. Miss. Code Ann. §§ 97-3-27 to 97-3-47 (Rev. 2006). The statutes do not refer to any form of manslaughter being of a varying degree or "lesser" than another form. Further, the plain language of Section 97-3-47 distinguishes itself from our other manslaughter sections. Section 97-3-47 begins with stating "every *other* killing of a human being . . . ." The word "other" in Section 97-3-47 divides the Section from the remaining ten manslaughter statutes.

¶76. I do note, however, that the Fifth Circuit has found that, under the federal manslaughter statute, involuntary manslaughter is a lesser-included offense of voluntary manslaughter. ***United States v. Browner***, 889 F. 2d 549, 553 (5th Cir. 1989) (footnote omitted). Notably, the wording of the federal statute is different from our state statutes. The federal statute provides:

> (a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds: Voluntary – Upon a sudden quarrel or heat of passion. Involuntary – In the commission of an unlawful act not amounting to a felony,

30

or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

18 U.S.C. § 1112(a) (2009). In holding that involuntary manslaughter is a lesser-included offense, the Fifth Circuit stated:

> . . . [I]nvoluntary manslaughter is also necessarily a lesser included offense of voluntary manslaughter. Voluntary manslaughter encompasses all of the elements of murder: it requires proof of the physical act of unlawfully causing the death of another, and of a mental state that *would* constitute malice, but for the fact that the killing was committed in adequately provoked heat of passion or provocation. Involuntary manslaughter requires proof only of a subset of those elements: the same physical act, but only a reduced mental state and no requirement at all for heat of passion or provocation. Thus, under the elements test, involuntary manslaughter under the federal statute is necessarily a lesser included offense of voluntary manslaughter.

**Browner**, 889 F. 2d at 553 (emphasis in original).

¶77. However, of significant import is that, under the federal statute, the punishment for voluntary manslaughter is more severe than the punishment for involuntary manslaughter. Under federal law, one who is guilty of voluntary manslaughter shall be punished, *inter alia*, by imprisonment for not more than fifteen years, while one who is guilty of involuntary manslaughter shall be punished, *inter alia*, by imprisonment for not more than eight years. 18 U.S.C. § 1112(b) (2009). On the other hand, in Mississippi, we have eleven manslaughter statutes,[4] all of which provide for a punishment, *inter alia*, of imprisonment in the state penitentiary for not less than two years nor more than twenty years. Miss. Code Ann. § 97-3-25 (Rev. 2006).[5]

---

[4] Miss. Code Ann. §§ 97-3-27 to 97-3-47 (Rev. 2006).

[5] I in no way intend for today's discussion on the commonality of the statutory penalties for the various forms of manslaughter to be read as an additional requirement to the well-established elements test used in Mississippi. **Friley v. State**, 879 So. 2d 1031,

¶78. In sum, prior to today, this Court has not yet addressed the issue of whether general manslaughter is a lesser-included offense of heat-of-passion manslaughter. But other jurisdictions have found that general, or involuntary, manslaughter is not a lesser-included offense of voluntary manslaughter. *See* ***People v. Orr***, 27 Cal. Rptr. 2d 553, 556 (Cal. Ct. App. 1994) ("Voluntary manslaughter can be committed without committing involuntary manslaughter, and thus the latter is not a lesser included offense of voluntary manslaughter."); ***State v. Joseph***, 499 N.W.2d 858, 859 (Neb. Ct. App. 1993) ("Involuntary manslaughter is *not* a lesser-included offense of voluntary manslaughter.") (emphasis in original). *See also* ***Quinlivan v. State***, 627 So. 2d 1082, 1087 (Ala. Crim. App. 1992) ("[R]eckless manslaughter and sudden heat-of-passion manslaughter are distinct and mutually exclusive aspects of manslaughter.").

¶79. Finding that general manslaughter as defined in Mississippi Code Section 97-3-47 is not a lesser-included offense of heat-of-passion manslaughter as defined in Mississippi Code Section 97-3-35, I am constrained to find that the Court of Appeals erred in *sua sponte* converting the trial-court conviction of heat-of-passion manslaughter under Section 97-3-35 to a general-manslaughter conviction under Section 97-3-47.

¶80. I respectfully disagree with the plurality's finding that the evidence in today's case supports Nolan's heat-of-passion manslaughter conviction. I also find that general manslaughter under Section 97-3-47 is not a lesser-included offense of heat-of-passion

1034 (Miss. 2004) (citations omitted). This discussion is simply further support of the contention that our Legislature intended Mississippi's eleven manslaughter statutes to be separate and distinct offenses.

manslaughter under Section 97-3-35. Thus, in my opinion, the Court of Appeals erred when it converted the heat-of-passion-manslaughter conviction into a general-manslaughter conviction and then affirmed the trial-court conviction for manslaughter. I would thus reverse the judgment of the Court of Appeals, and reverse and render the trial-court judgment of conviction and sentence for heat-of-passion manslaughter.

¶81.    For the reasons discussed, I respectfully, but fervently, dissent.

**DICKINSON, P.J., AND KITCHENS, J., JOIN THIS OPINION.**